Flinn, Assignee, v. Bagley and others.

(*District Court, E. D. Michigan.*  June 27, 1881.)

1. CORPORATION—LIABILITY OF STOCKHOLDERS.

Where defendants subscribed and agreed to pay certain sums of money towards the increased capital stock of a corporation, with the understanding that they were to receive stock therefor at 66⅔ cents upon the dollar, and this arrangement was carried out, and certificates for the stock delivered to them, *held*, that the assignee in bankruptcy of the corporation might still collect the remaining one-third of the par value of the stock for the benefit of its creditors.

In Equity.

This was a bill in equity by the assignee of the Detroit Novelty Works to compel the payment of the balance due upon certain unpaid subscriptions to the capital stock of the company. The material facts were that the company was organized in 1859, with a capital stock of $50,000, divided into 2,000 shares of $25 each. In 1871 it was proposed to increase the stock of the company to $100,000, and the following agreement was entered into by the defendants in this suit, or by those from whom the defendants hold their stock:

"The undersigned subscribe hereby the amount set opposite our respective names, and agree to pay the same towards the increased stock of the Detroit Novelty Work, in three equal instalments, on April 3, 1871, May 3, 1871, and June 3, 1871, (without grace,) it being understood that stock shall be issued to subscribers for such subscriptions at 66⅔ cents upon the dollar, and that a total amount of the subscriptions hereto shall be $20,000; and further, that negotiations upon the basis proposed by T. W. Misner, under date of March 31st shall be completed before these subscriptions shall be of binding force. Detroit, April 1, 1871."

This agreement was assented to by all the existing stockholders of the company, and was carried out by the payment of the money, $20,000, and the issuance of the stock, $30,000. The corporation having gone into bankruptcy, and its assets proving insufficient to pay its liabilities, the complainant in the suit, who had been chosen its assignee, filed this bill to compel the defendants, who are stockholders of the company under the above subscription, to pay one-third of the par value of the increased stock taken under that agreement. On July 29, 1874, a majority of the directors of

v.7,no.9—50

the company filed with the secretary of state the annual report required by statute, in which it was stated that the amount of capital paid in was $75,000; and also set forth the names of the stockholders and the number of shares held by each, the aggregate being 4,000 shares, which at $25 each would be $100,000.

*H. M. Campbell* and *Alfred Russell*, for complainant.

*C. A. Kent* and *F. A. Baker*, for defendants.

BROWN, D. J. That the capital stock of a corporation is a trust fund for the payment of its debts, and that the law implies a promise by the subscribers of stock to pay its par value, which in this instance was $25 per share, when called for, and that no subsequent release of their original contract or subscription by the corporation will avail against the claims of creditors, are propositions too clearly established to admit of question. But whether a court cannot only compel a subscriber to live up to a bargain he has made, but can make another bargain for him, and compel him to live up to that, is a different question. In the case under consideration it is clear that no actual fraud was intended. The novelty works found itself embarrassed for means, and resolved to raise money by increasing its capital stock. As its existing stock, however, was worth only two-thirds of its par value, it was obviously impossible to sell its new stock at par, since all the stock would stand upon an equal footing and no one could be found to pay a dollar for that which was worth but 66⅔ cents. There was, therefore, no recourse but to issue new stock at its real value. All the stockholders of the corporation having assented to this arrangement, it was evidently no fraud upon them, and the corporation itself would be estopped to claim more than the agreed price. Neither was it a fraud upon the existing creditors, since the assets of their debtor were increased by the amount of money actually paid in, and, to that extent, they were benefited by the subscription.

It is, then, only as a fraud upon future creditors that exception can be taken to the transaction. While the statute (Comp. Laws, § 2841) requires the capital stock of such corporations to be divided into shares of $25 each, there is no

express prohibition against stock being issued for less than its par value. But conceding, upon the authority of *Hawley* v. *Upton,* 102 U. S. 314, and *Sturgis* v. *Stetson,* 1 Bissell 246, that the directors of a corporation have no right to issue stock at less than its par value, that the subscription was void, and that an action will lie by the assignee of the corporation against the contributories to compel a surrender of the stock or payment for the same at its real value when the subscription was made, does it follow that a court can compel the subscribers to pay the par value of the shares? Subscriptions to the stock of a corporation are purely a matter of contract. *Sturgis* v. *Stetson,* 1 Biss. 248; *Parker* v. *North Cent. Mich. R. Co.* 33 Mich. 24. And where there is an express contract the law will not permit one to be implied. *Cutter* v. *Powell,* 6 T. R. 324. *Pittsburgh & Connersville R. Co.* v. *Stewart,* 41 Pa. 54–58. Undoubtedly, when a subscriber originally agrees to take so many shares, the law will imply that he is to pay at the rate of $25 per share, and no subsequent release or modification of that agreement by the corporation will prevent creditors from insisting upon full payment. But the English cases hold that if for any reason the subscription be void at all, it is void *in toto,* and that the assignee cannot treat it as void to compel a return of the stock and valid to obtain the payment of its par value. It follows from this that if the contributory agrees only to take paid-up shares he cannot be compelled to take unpaid shares.

In *Currie's Case,* 3 De G. J. & S. 367, directors of a company took a transfer of paid-up shares from an allottee who had them allotted to him by the company in part payment of purchase money in respect of certain property purchased by the company. The same directors were also holders of other paid-up shares, taken by them for attendance fees. The validity of the purchase in the one case, and the allowance of attendance fees in the other, were impugned. Held, that the transactions could not be affirmed in part and repudiated in part, and that consequently the directors, if treated as shareholders at all, must be treated as paid-up shareholders, and not placed on the list of contributories in either case.

In delivering the opinion of the court of chancery, Lord Justice Turner observed:

"These shares were allotted to Butcher under the authority given by the articles as paid-up shares, in part of the consideration of the purchase made by the directors from him. The purchase was either valid or invalid. If valid, it is clear that neither he nor his alienees can be called upon to contribute in respect to these shares. If invalid, I cannot see my way to hold that either a court of law or a court of equity could do more than treat the purchase as void, and undo the transaction altogether. It could not, as I apprehend, be competent either to a court of law or to a court of equity to alter the terms of a purchase, and treat as shares not paid up shares which were given as paid-up shares, in part consideration of the purchase. Fraud, assuming there was fraud, would of course warrant the court in treating the purchase as void, or in undoing it; but it could not, as I conceive, authorize any court to substitute other terms."

In *Carling's Case*, L. R. 1. Ch. Div. 115, an agreement was entered into with the trustee of an intended company for the sale to the company of a property for a certain sum in cash, and a certain number of fully-paid-up shares. The vendor applied to the appellants to become directors, which they agreed to do upon his promising to transfer to them fully paid-up shares to qualify them. They acted as directors and adopted the agreement for sale. Appellants were entered on the register as holders each of 30 fully-paid-up shares, and received certificates to that effect. An order was afterwards made for winding up the company, and the master of the rolls put them on the list of contributories for 30 unpaid shares each. It was held that as there was no contract between them and the company that they would take shares independently of their accepting certificates, stating them to be the holders of fully-paid-up shares, they could not be placed on the list of contributories as holders of unpaid shares. In delivering the opinion, Lord Justice James said:

"Now, beyond all question, they never made themselves liable to take any shares at all. They never contracted to take shares or to pay for shares. The only contract between them and the company was the contract that arises from the fact that certificates of the shares as paid-up shares were sent to them and they accepted these certificates. If, therefore, the case depends upon a contract between them and the company, the contract must be either approbated or reprobated. If the contract was a contract that they would take paid-up shares, we cannot convert that into a contract to take unpaid shares."

Lord Justice Mellish used the following language:

"It appears to me that the only contract entered into by these gentle-men with the company being that they became members of the company by accepting certificates of paid-up shares, that contract must either be adopted or rejected in its entirety. If it is rejected, they are not share-holders at all. If it is adopted, the company is entitled to say 'they are not your shares but ours,' but that does not make them hold unpaid shares."

This intimation would tend to show that the assignee in this case might bring an action against the defendants for the value of the shares they agreed to take; but as there is no evidence that the shares were worth any more than the defendants paid for them, such action would probably be fruitless.

In *De Ruvigne's Case*, 5 Ch. Div. 306, it was held that an arrangement with a subscriber by which he was to take 200 shares of stock was fraudulent and *ultra vires*, but as there was no agreement to take any but paid-up shares, he could not be placed on the list of contributories in respect of the 200 shares. The court held that the company must either throw over the agreement altogether, or they must take it alto-gether. "They cannot adopt it as to one part and reject it as to the rest."

In *Anderson's Case*, 7 Ch. Div. 94, similar language was used, and the master of the rolls observed:

"I am not going to alter men's contracts unless the provisions of an act of parliament compel me to do so. If a man contract for paid-up shares with a company, and there is no other contract,—that is to say, if there is no previous contract to take shares at all,—and the company allots the paid-up shares, * * * it is quite evident that neither party can alter the contract. * * * It may ask to set aside the contract altogether, and in that case the shares would not be treated as allotted at all, and the consideration would have to be returned to the director or other person holding a fiduciary position, or the company may adopt another course, and may treat the director or other person holding a fiduciary position as trustee for the company of the profit made by the contract, and may take away the profit from him. * * * But you can-not alter the contract to such an extent as to say, though you have bar-gained for paid-up shares, we will change that into a bargain to take shares not paid up, and to put you on the list of contributories on that ground."

In *Foreman* v. *Bigelow*, 18 N. B. R. 457, these cases were cited with approval by Mr. Justice Clifford, although the

case cannot be considered as a direct authority here, as the action was brought against an innocent purchaser of such shares.

These cases appear to be decisive in favor of the position assumed by the defendants here. There is, however, a series of opinions of the supreme court of the United States, beginning with the cases of *Upton* v. *Tribilcock*, 91 U. S. 45, and culminating in *Hawley* v. *Upton*, 102 U. S. 314, which put the obligation of a subscriber to stock in an entirely different light. While none of these cases except the last are necessarily inconsistent with the views expressed by the English courts, or with the position assumed by the defendants here, the general drift of the opinions is to the effect that the acceptance of a certificate of stock, not fully and actually paid up, *ipso facto*, obligates the holder to make up its par value if the duty of the corporation to its creditors requires it, although he originally agreed to take the stock as fully paid up.

In *Upton* v. *Tibilcock*, 91 U. S. 45, the defendant agreed to become a stockholder, and, with intent to become such, accepted a certificate for stock whereby he became bound to pay the full amount thereof as follows: Five per cent. upon the delivery of the certificate; 5 per cent in three months; 5 per cent. in six months; 5 per cent. in nine months; and the residue whenever called for by the company, according to the charter of the company and the laws of the state of Illinois. The defence was that the subscription was obtained by the fraudulent representations of the agent of the company, to the effect that the defendant would only be responsible for 20 per cent. of the subscription made by him, and that he delivered his note in full payment of this amount. He received a certificate with the word "non-assessable" printed across the face. It was held that the legal effect of the instrument was to make the remaining 80 per cent. payable upon the demand of the company, and that the word "non-assessable" was no qualification of this result. "At the most, the legal effect of the word in question is a stipulation against liability to further taxation or assessment after the

holder shall have fulfilled his contract to pay the 100 per cent. in the manner and at the times indicated." In other words, the court adopted the view that the original contract of the subscriber was to pay the par value of the stock, and that the word "non-assessable" did not vary this contract.

While there is nothing in *Chapp* v. *Upton*, 95 U. S. 666, irreconcilable with the position assumed by the defendants here, Mr. Justice Hunt, in delivering the opinion, observes that when a stockholder receives a certificate of stock for a certain number of shares at a given sum per share, he thereby becomes liable to pay the amount thereof when called upon by the corporation or its assignees. The cases of *Pullman* v. *Upton*, 96 U. S. 328, and *Hatch* v. *Dana*, 101 U. S. 205, contain little more than a repetition of the principles laid down in the former cases, and have no especial bearing upon the case under consideration.

The case of *Hawley* v. *Upton*, 102 U. S. 314, is very nearly if not directly in point here. In this case the defendant signed an agreement to the effect that for a consideration of 10 shares of the capital stock of the Great Western Insurance Company, received by him, he agreed to pay one-fifth of the par value thereof in instalments. His name was entered on the books as a stockholder, but no certificate of stock was ever delivered to him, and no demand ever made upon the company for such certificate. The supreme court held him liable, upon the theory that the company could not sell its stock at less than par, and that his agreement amounted in law to a subscription for the stock and nothing else, and that the receipt of the certificate was not necessary to complete his obligation, as against the creditors of the company. I have sought to find a tenable ground upon which to base a distinction between this case and the one under consideration, but it seems to me that there is no substantial difference between them. Here is an agreement, literally, to subscribe a certain sum and to take in payment therefor a certificate, the par value of which was fixed by law, representing a sum one-third larger than the amount of the subscription. How does this differ from the agreement in

*Hawley* v. *Upton,* by which the defendant acknowledged the receipt of 10 shares of stock, the par value of which was also fixed by law, and, in consideration thereof, promised to pay one-fifth of such par value? The whole contract in each case must be taken together. In the one the promise to pay precedes the statement of the consideration; in the other the acknowledgment of the receipt of the consideration precedes the promise to pay; but in legal effect both are agreements to take stock and to pay therefor only a percentage of its par value. In neither case does the party agree to pay no more if the necessities of the company require, though in the light of these decisions it would seem to make no difference as against creditors whether he did or not. If, as was said by the chief justice in *Hawley* v. *Upton,* "all that need be done, so far as creditors are concerned, is that the subscriber shall have bound himself to become a contributor to the fund which the capital stock of the company represents," it is difficult to see why the defendants in this case have not done all that is necessary to make themselves liable for the payment of the amounts claimed. The statement of the court that the suit was not brought on the special agreement of the defendant to pay 20 per cent., but on his general liability as a subscriber to pay for his stock whenever it was wanted to meet the liabilities of the company, is equally applicable when it is made to appear that the defendants received certificates of stock for which they had paid only two-thirds of its par value.

This case is certainly a hard one upon the defendants. Finding the company embarrassed for the want of funds, they agreed to subscribe a certain sum and take in payment stock at what it was really worth. It is clear that no fraud was intended, and that they must be held liable upon an implied agreement to pay more for the benefit of the creditors than they had expressly agreed to pay for the benefit of the corporation. It is a hardship, however, from which I see no way of relieving them consistent with the views of the supreme court in *Hawley* v. *Upton,* and a decree must therefore be entered for the complainant.