## Case No. 13,568.

### STURGES v. STETSON.

[1 Biss. 246; [1] 3 Phila. 304; 15 Leg. Int. 404; 2 Wkly. Law Gaz. 342.]

Circuit Court, S. D., Ohio.   Oct. Term, 1858.

RAILROAD COMPANIES—STOCK—FRAUDULENT ISSUE —CHARTER—CONVERTIBLE BONDS— EXECUTORY CONTRACT.

1. The sale of stock in a railroad company by the directors at a less rate than the price fixed in the charter, is a fraud upon the law and the stockholders.

[Cited in Fosdick v. Sturges, Case No. 4,956; State Ins. Co. of Missouri v. Redmond, 3 Fed. 767; Flinn v. Bagley, 7 Fed. 787; Taylor v. South & N. A. R. Co., 13 Fed. 155.]

[Cited in Fitzgerald v. Fitzgerald & Mallory Const. Co., 59 N. W. 870; Jackson v. Tracy, 64 Iowa, 477, 20 N. W. 767; Oliphant v. Woodburie Coal & Min. Co., 63 Iowa, 338, 19 N. W. 214.]

2. The issuing by the directors of a bond convertible into stock is the same in effect as the sale of so much stock, and the sale of such a bond at a discount is unlawful and void. Stock thus taken is, in the hands of a party with notice, subject to the right of prior subscribers to have it reduced to the charter value of the shares.

[Cited in Foster v. Seymour. 23 Fed. 66.]

[Distinguished in Wood v. Whelen, 93 Ill. 163.]

3. Stock can be created only by contract— there must be an agreement to take it.

4. A power given to the directors by the charter to sell the property of the company or notes and bonds belonging to it, does not apply to the capital stock, nor does the power to determine the time and terms of payment of subscriptions for stock have any reference to its price.

[Cited in Kitchen v. St. Louis, K. C. & N. Ry. Co., 69 Mo. 230.]

5. The case is different in principle from the sale of stock on execution or under the charter on default of payment. in which case the gain or loss is that of the delinquent stockholder, the other stockholders not being in any way affected.

6. It is not necessary that the charter contain a prohibition against taking subscriptions at less than the charter price.

7. Although to an innocent holder the company would be liable for stock thus issued, these facts constitute a good defense to an action upon an executory contract for the purchase of such stock.

At law.

Goddard & Stanberry, for plaintiff.

Worthington & Matthews, for defendant.

McLEAN, Circuit Justice. This action is brought on a promissory note for $24,000, made to plaintiff by defendant, dated February 4th, 1853, and payable on demand. The questions before the court are raised by the ninth plea, which states that the Hillsboro and Cincinnati Railroad Company, on the 31st of January, 1853, was engaged in the construction of its line of road from Cincinnati to the Ohio river, at or opposite Parkersburg, in Virginia; that its capital stock, under various acts of the legislature, was five millions of dollars, and was divided into shares of fifty dollars each; that the subscriptions of stock were regularly under the control of the board of directors for the time being, yet that neither the board of directors nor the company had power by their charter, or by the laws of the land, to issue and dispose of stock at less than fifty dollars per share; that the plaintiff, being a dealer in railroad stocks, entered into an unlawful scheme and device, with the board of directors, that they should execute to him a bond for $750,000, payable in January, 1858, without interest, and within four years from date, convertible into fifteen thousand shares of stock, at fifty dollars each; and that the said bond should be sold and delivered to the plaintiff for $521,677, payable on the call of the company, which sum was less by $228,333 than the amount of the shares purchased by him; and the plea further averred that the plaintiff, on the 4th of February, 1853, still holding six hundred shares of the above purchased stock, of which he represented himself to be the lawful holder, induced the defendant to purchase the same, and as a consideration for which he gave the promissory note on which the action is founded; and the power of the directors to issue the stock by the charter or under the laws of the state, at less than fifty dollars for each share, is denied.

To the special plea a general demurrer was filed. In the original act of incorporation, the capital stock was limited to three hundred thousand dollars, to be divided into shares of $50 each. The sum of one hundred and fifty thousand dollars was required to be subscribed, before the structure of the road should be commenced. In a subsequent act, this sum was reduced to one hundred thousand dollars.

The 12th section authorizes the directors to require payment of capital stock subscribed, by installments, as they shall think fit; and if the installment shall remain unpaid for sixty days after the time required, the board may collect the same by suit, or shall have power to sell the stock at public auction. By the 15th section, the directors are authorized to mortgage the capital stock, to secure the payment of money borrowed.

The act of 1849 increased the capital stock to nine hundred thousand dollars; and the amendatory act of 1851 increased it to five millions of dollars. By a special act of 5th of February, 1851, the company was authorized to sell its bonds, issued for loans, and its notes and certificates, payable in money or property received as donations, or in payment of subscriptions to its stock, above or below par.

By the 5th section of the original act, the affairs of the company were vested in seven directors, a majority of whom were authorized to act; and, by the 6th section, it is declared that the directors may determine

---

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

"the times and terms of payment of stock."

There appears to be nothing in the various legislative acts that constitute the charter of this company, which is not common to other railroad companies chartered in this state. In the consideration of this case, it is necessary to ascertain the nature of the contract between the directors and the plaintiff. Was there a sale, or a subscription of stock, or both? When the parties came together, with a view to this transaction, there is no pretense to say that the fifteen thousand shares were stock. They constituted a part of the capital stock, as provided in the charter, but in no other sense were they stock. The corporate powers of the company were conferred for the express purpose of creating stock as a means of constructing the railroad. As well might the route for the road designated be called a railroad, as to call the corporate means of creating the stock, stock. In a legal point of view, it is important to call things by their right names. This is especially necessary when the effect of the exercise of corporate powers is to be determined.

Stock can be created only by contract, whether it be in the simple form of a subscription or in any other mode. There must be an agreement to take the stock, and nothing short of this can create it. This imparts to the stock the quality of property, which before it did not possess. It is called capital stock in the charter, because the corporate capacity to create it is given. The term stock, as used in the charter, before it is taken by subscription, means nothing more than a power in the directors to receive subscriptions for stock.

The plea sufficiently shows that there was no sale of stock to the plaintiff, which had been previously issued, but an attempt to create the stock and sell it at the same time, as one transaction; and it appears that the discount of nearly one-third of the shares purchased, was a part of the contract of subscription; and this presents the great question in the case, whether the directors had power to issue the stock for less than its par value.

If it is not admitted in the argument, it is not controverted, that the commissioners who, before the organization of the company, received subscriptions of shares, had no power to receive them for less than the amount stated in the charter. But it is said that the subscription of the plaintiff was not received by the commissioners, but by the board of directors, who exercised all the powers of the corporation; and among others, the power of sale over its property; that the sixth section of the charter gives them express power over the stock, "to determine the time and terms of payment."

As capital stock is not property until it shall be subscribed for, the power given to the directors in the charter, to sell the property of the company, does not apply to the disposition of capital stock; and it seems to be clear that the power to determine the time and terms of payment of subscriptions of stock, can have no reference to its price. The charter declares the shares of the capital stock shall each be fifty dollars; and it would be contrary to all known rules of construction to say that a provision that applies only to the payment of stock subscribed, shall be so construed as to repeal the provision that fixes the value of each share.

There may be many instances where land is purchased for a depot, or for other purposes connected with the road, or where work has been done on the road, or rolling stock furnished for it, a subscription for stock may be given, by the directors, in payment. But, whether land, labor, property or money be received in payment, the principle is the same. The directors may regulate the time and terms of payment, but they have no power over the price of each share.

In declaring that the capital stock should be divided into shares of fifty dollars each, the law was designed to give the same permanency to the limitation of the shares, as to the limitation of the capital stock. A subscription procured of fifteen thousand shares, amounting to the sum of seven hundred and fifty thousand dollars, with the understanding that it should be discharged on the payment of about one-third less, was a fraud upon the law and upon the stockholders. The term fraud is here used in no other sense than as an act done without the authority of law, and against the provisions of the charter, and this epithet legally applies, however innocently the act may have been done by the directors.

In regard to the price of the shares, the directors have no greater power over it than the commissioners had. They were both the instruments of the law, and were alike bound by its provisions. If power had been given to either to exercise a discretion so vital to the success of the scheme, as to vary the price of shares, it would have destroyed all confidence in the enterprise. The plaintiff seemed to have been convinced of this, from the plan adopted to receive from the company the first bond for seven hundred and fifty thousand dollars, to give to the act an appearance of fairness on the books of the company. It is essential to the success of any enterprise which involves the expenditure of money, that the contributors should be placed upon an equal footing in regard to the money paid. In this case the plaintiff received in stock $228,333 more than he paid for. This was a fraud on the stockholders who had paid in full for their shares.

It is said the directors had power to secure the payment of loans, by mortgage on capital stock. This is admitted. In the 16th section of the first act it is provided, that to secure the payment of money and the interest thereon, borrowed, "the directors may pledge, by mortgage or otherwise, their en-

tire road, fixtures, and equipments, with the income and resources thereof, together with the capital stock."

What was meant by the capital stock in this provision? Does it refer to the stock named in the charter, and for which no subscription has been made? Such stock is a legal fiction. It is not in esse, and, as such, cannot be a subject of mortgage. What security under the mortgage could it afford? It is, at least, nothing more than a right to subscribe for stock, which is common to all persons; and every one who does subscribe, confers a favor on the company. The power given to the directors to pledge the capital stock was, undoubtedly, intended to cover the capital stock, which was owned by the stockholders, and was property that might be mortgaged at the time.

It is admitted that stock may be sold on execution after judgment against a stockholder, under the statute, or it may be sold at auction, under the charter, for default of payment, at less than its nominal value. In either case the stock being property may be sold, as other personal property, for what it may bring. On a sale at auction, or execution, nothing is sold but the interest of the stockholder, and the purchaser acquires only his right.

If the stock has been paid for in part only, the new owner must pay the installments required under the rules of the company; and if he fail so to do, the stock may be again sold. The same rule of procedure applies where the stock is sold on execution. In neither case is it important that the stock should sell for the amount paid on it. If it sell for more it is the gain of the delinquent stockholder; if for less, it is his loss. But, by the sale, the interest of the other stockholders is not affected. If the stock has been paid in full, and it sell for half the amount so paid, the sale is valid and the interests of the other stockholders remain unaffected. The stock, like other property, being subject to the claims of creditors, is liable to loss on forced sales.

But such a procedure is altogether different in principle from the act of taking subscriptions of stock. It is said there is nothing in the charter which prohibits the directors from taking subscriptions of stock for less than fifty dollars a share.

No such provision was necessary. The duties of the directors are plainly pointed out in the charter, and as their powers were wholly derived from that instrument, it was not necessary to prohibit them from doing that which the charter did not authorize them to do. The charter fixed the rates at which the shares should be subscribed. This is matter of law, and is no more subject to the discretion of the directors, than it was to the discretion of the commissioners, who first received subscriptions.

From the authority given to the directors to sell "notes, bonds, scrip, and certificates for the payment of money or property, which the company had previously received, as donations, or in payment of subscriptions to the capital stock," above or below par, an argument is drawn that stock may be disposed of to subscribers for less than fifty dollars a share. It appears to me the provision authorizes an inference in conflict with the one drawn. If bonds, or other instruments for the payment of money, be transferred at less than their face, with legal interest on the entire sum, in payment for the money loaned, it would be usurious; and this was the reason for the above provision. Without it, the sale of the bonds, &c., would have been illegal.

A certificate of stock was issued to the plaintiff for fifteen thousand shares, amounting to the sum of seven hundred and fifty thousand dollars, of which only five hundred and twenty-one thousand six hundred and seventy-seven dollars were paid, which was less for the shares than the price fixed by the charter, by two hundred and twenty-eight thousand three hundred and three dollars. This sum, distributed among the share-holders at the time of the transaction, will show the loss they sustained; and if this be a correct construction of the powers of the directors, they may continue to reduce the price of stock, at every subsequent subscription, down to five or ten dollars a share, distributing the loss upon prior stockholders. The last subscribers, at whatever rate, would stand on an equality as to future dividends, and in all other respects, with the previous subscribers for stock, who had paid in full for their shares. The injustice of such a scheme requires no demonstration. It is in conflict with the charter.

[Such has been the depression of railroad enterprises in this country, that I can readily conceive many stockholders who have largely subscribed and paid for stock might be willing to sacrifice their stock to complete the road; and such a high and patriotic motive, prompted by considerations of the public interests, is not to be condemned. But such an arrangement could only be carried out legally, if at all, by a voluntary acquiescence, in the surrender of a part or the whole of his stock, by every stockholder.] [2]

From the high character of the individuals who compose this company, I feel bound to say that in my judgment, their error has arisen from a misconstruction of their corporate powers. But the principles of law apply to the act, and not to the motive, where no moral turpitude is involved. I think the subscription of the plaintiff, as made, was void.

[Whatever right the plaintiff may have against the defendant arises from the sale to him of the six hundred shares of stock in controversy. The stock was to be transferred to the defendant on the payment of the note on which this suit is brought. Under the de-

---

[2] [From 15 Leg. Int. 404.]

murrer, any defect in the plea is open to the objection of the plaintiff. And he takes exception to the averment of value in the plea, as it is laid under a videlicet, and is, therefore, not material.] [2]

The averment in the plea is that the directors issued, or caused to be issued to said plaintiff, certificates for said fifteen thousand shares of said company's capital stock at fifty dollars a share; that is to say, at par value, dollar for dollar.

[2] [It is difficult to find, on a nice point of pleading, uniformity of decision. It is said that the office of a videlicet is to show that the party does not undertake to prove the precise facts alleged. But if the averment be material, he is obliged to prove it, though it be laid under a videlicet. Where the declaration stated an usurious agreement, on the 14th of the month, to forbear and give day for payment for a certain period, but it was proved that the money was not advanced till the 16th, the plaintiff was non-suited; it being held by Lord Mansfield at the trial, and afterward by the court in bank, that the day from whence the forbearance took place was material, though laid under videlicet. Steph. Pl. 294; Grimwood v. Barrit, 6 Term R. 460; Hardy v Cathcart, 5 Taunt. 2. Mr. Stephens says in his Pleadings (page 294) all material facts must be truly laid, as a videlicet, in such a case, can give no help. There is a class of facts, not going to the substance of the action, which may become material allegations, and must be proved; but such facts, when laid under a videlicet, need not be proved. A videlicet will not avoid a variance or dispense with the exact proof in an allegation of a material matter. It is admitted, when time is material, and an impossible time is alleged, the pleading is demurrable. But where a material averment is made under a videlicet, it does not disperse with the exact proof of the fact laid. The objection is that the averment of value in the plea, as to the stock, is material; but, being laid under a videlicet, it is not necessary to prove it on the trial, and therefore it is not material. If the averment be material, and it is laid under a videlicet, still it must be proved as laid, according to the authorities, and consequently, on demurrer, it must be taken as true. As before remarked, there are many things connected with the essential parts of a case which, if laid without a videlicet, must be proved, but which need not be proved if laid with a videlicet.] [2]

This action is in the nature of a bill in equity for the specific execution of a contract, and the defendant may avail himself of any matter in defense, which goes to impair or make void the contract.

[In this view of the case, it is proper to refer to the averments of the ninth plea which the demurrer admits to be true. It is charged in that plea that the plaintiff entered into a corrupt agreement, through which he obtained the certificate for fifteen thousand shares of stock from the company, at a sum near one-third less than the price per share fixed by the charter; and that to induce the defendant to subscribe for the six hundred shares he represented himself to be the lawful owner of such stock.] [2]

Whatever doubts may arise from the conflicting decisions in the courts of England and of the United States, in regard to fraud, and whether certain transactions are fraudulent per se, or are only evidence of fraud, being void or voidable, there would seem to be little doubt of the character of the case as made out in the plea, and which the demurrer admits. The allegations of fraudulent acts by the plaintiff in the procurement of the stock, are coupled with a want of power in the directors so to issue it.

[This case is said to be similar to that of Schuyler's. On some points they are alike; on others they differ. In Schuyler's case the stock of the railroad had all been issued. The certificate of stock was a forgery, signed by the agent of the company, transferred to the bank on which the money was loaned. The court held that the assignee of the certificate took only the equitable right of the assignor, as a legal transfer could only be made on the books of the company; and as the certificate was forged, there was no equity in the holder.] [2]

The subscription of stock by plaintiff for less than the price of the shares fixed in the charter, was void, as against law and the power of the directors. But the stock procured by the plaintiff was open for subscription, and from the bond executed to him by the company for seven hundred and fifty thousand dollars, convertible into stock, and which he converted into stock, the books of the company represented a fair and legal transaction; and in the hands of an innocent holder of the stock so issued, the company would, I suppose, be held liable. While the law clothes a corporation with the powers of an individual to make contracts, it gives to it no immunity to practice frauds upon innocent persons. But the defendant has never received the stock assigned to him by the plaintiff. It was assigned to him as stated in the plea, and left in the trust company, to be delivered on the payment of the note sued on. But on a discovery of the frauds alleged in the plea, he refused to pay the note, and the question now is, whether he shall be compelled to carry out the contract for the stock.

If it be admitted that the defendant, on application to the company, or by legal coercion could obtain a recognition of his right to the six hundred shares of the stock, on the books of the company, is he bound to take such a course? If on a full knowledge of the facts set up in his plea, the defendant takes the stock, he holds it subject to the right of the

stockholders, prior to the subscription of the plaintiff, to have it reduced to the charter value of the shares. This would take from him nearly one-third of his shares.

The contract of the plaintiff is executory. He occupies a point which gives him the option to pay the money, and carry out the contract, or to stand on the matters in bar, which he has set up in his plea. He has taken the latter ground, and it is for the court to say whether it is maintainable.

[This stock was purchased from the plaintiff by the defendant at less than its par value; but a stockholder may sell his stock at any price he may think proper. Such sale affects no one's interest but his own. In this respect it is like all other property over which the owner may exercise his discretion.] 2

The defendant seems to have done nothing to preclude him from the defense set up in his plea, which stands admitted by the demurrer, and which, in my judgment, is a sufficient answer to the action.

The demurrer is overruled.

Consult Otter v. Brevoort Petroleum Co., 50 Barb. 247; also, Cases Nos. 4,956 and 13,569.