JACKSON v. TRAER ET AL.

1. **Corporations:** ISSUANCE OF STOCK FOR LESS THAN PAR: LIABILTY OF THE HOLDERS FOR UNPAID BALANCE: THE RULE DISCUSSED AND APPLIED. The directors of a corporation have no power to issue stock for less than its par value, or with an understanding that the unpaid balance shall not be called for; and to do so is a fraud upon the law, the other stockholders and the creditors of the company, and the transaction will not be sustained, but the persons so securing the stock will be liable for the unpaid balance in an action by a creditor of the corporation, under § § 1082 and 1084 of the Code. And it is not necessary to such liability that the holder of the stock so issued should have subscribed for the same, for his acceptance of the stock, with knowledge of the facts, is sufficient to create the liability. Nor is the rule different where the corporation is insolvent, and its stock of, at most, doubtful value, and the stock is issued to a creditor in settlement of a demand which it had no other means of paying. Accordingly, in this case, where a railway company was indebted to a construction company in the sum of $70,000, which it was unable to pay, and, in satisfaction of the debt, it issued to the construction company certificates of stock of the face value of $350,000, which shares were distributed among the members of the construction

company, *held* that such members were stockholders, the same as if they had subscribed for the stock and paid 20 per cent thereon, and that they were liable, under the statute, to a creditor of the corporation, to the extent of the unpaid 80 per cent of the par value of the stock,—the $70,000 debt, paid by the stock issued, being only 20 per cent of the par value of the $350,000 of stock so issued.

ROTHROCK, C. J., and SEEVERS J., *dissenting*.

*Appeal from Linn Circuit Court.*

THURSDAY, OCTOBER 9.

*P. Henry Smyth & Son* and *D. L. Glasgow*, for plaintiff.

*Hubbard, Clarke & Dawley*, for appellee.

ADAMS, J.—This case is now before us upon a rehearing. It was submitted originally with the case of Louisa County National Bank against the same defendants. Both plaintiffs and defendants in the two actions appealed. The judgments were affirmed upon the plaintiffs' appeals, and reversed upon the defendants'. The plaintiff, Jackson, filed a petition for a rehearing, and a rehearing was granted. The questions presented upon the rehearing pertain to the correctness of the decision of this court upon the defendants' appeal. The action is brought under sections 1082 and 1084 of the Code. The plaintiff is a judgment creditor of the Burlington, Cedar Rapids & Minnesota Railway Co. The object of the action is to obtain an execution against stockholders of the company. It was brought originally against George Greene, as well as against the defendant Traer. Since then George Greene has died, and the defendant, Wm. Greene, has been appointed administrator of his estate. The action was brought upon the theory that Traer and George Greene were at the time of the commencement of the action, stockholders in the debtor company, and that eighty per cent of their stock remained unpaid. The defendants for answer filed a general denial, and pleaded that the plaintiff's judgment had been paid.

The court below held that Traer and George Greene were, at the commencement of the action, stockholders, and that

eighty per cent of their stock remained unpaid, and rendered judgment for the plaintiff for such balance as it found due, after applying a certain payment. This court held, when the case was before us upon the first hearing, that the stock should be treated as fully paid, the writer hereof dissenting.

The principal question discussed upon the rehearing pertains to the correctness of the ruling that the stock should be treated as fully paid. But, as we have reached a conclusion different from that reached by the majority upon the first hearing, it becomes necessary to consider some other questions.

I. Were Traer and George Greene owners of the stock in question at the time of the commencement of this action? We think that they were. It is not denied that they were such owners at one time. But the defendants contend that the evidence shows that they sold and transferred their stock to one Blair.

The evidence shows clearly enough a transfer, but we think it also shows a retransfer to Traer and Greene. One Brocksmith, formerly auditor of the railroad company, was called as a witness. He testified in these words: "I was auditor February 10, 1875, and I remember distinctly that John I. Blair received stock so as to have a majority, to give him a controlling power over the property, so far as stock would give it, or else he would not accept the presidency. Judge Greene invited him to be president. Greene, Traer, and others of the construction company, held stock issued to them till February 10, 1875, when it formed part of several thousand shares given in trust to John I. Blair, and Blair held it until sometime after the reorganization of the railway company, when it reverted again into the hands of the original owners. So far as George Greene is concerned, it was re-issued to him June 14, 1877, in certificate No. 2116, and to Traer in certificate No. 2177, dated June 18, 1877." The action was commenced in May, 1878. The stock referred to by the witness, Brocksmith, appears to be the stock now in controversy, and his testimony is sufficient to support the finding of the court below.

II.  Upon the question as to whether the plaintiff's judgment had been paid, we have to say that we think that the finding of the court below was as favorable to the defendants as they could properly ask.  The evidence shows that the property of the debtor railway company was sold at a foreclosure sale, and purchased by the Burlington, Cedar Rapids & Northern Railway Co.; that plaintiff intervened in the foreclosure action and claimed a lien upon the property; and the purchasing company, in order to obtain a release of the plaintiff's claim of a lien upon the property, issued to him fifty shares of its own stock, it being expressly provided that the release should not affect the plaintiff's claim against the debtor company.  The court below found that the receipt of the fifty shares of stock by the plaintiff operated as a payment to the extent of the par value of the stock, and rendered judgment only for the balance.  This, we think, is all that the defendants could properly claim.  There is no pretense that the stock was worth more than par.

It is, to be sure, contended that the plaintiff was fully secured by his lien, and that by releasing the same he released the defendants, or estopped himself from proceeding against them.  But we think that it is not shown that the plaintiff had a lien by which he was fully secured.  Besides, the defendants did not plead the release.  Whether a creditor of a corporation can proceed, under the statute cited, against stockholders, regardless of any security which the creditor may hold, or may have held, is a question discussed by counsel, but which, as we view the case, it is not necessary to determine.

III.  We come now to consider whether it is true, as the plaintiff alleges, that Traer and George Greene paid only twenty cents on a dollar for the stock issued to them in the debtor company, and, if so, whether the balance, to-wit, eighty per cent, can be treated as unpaid, and as constituting a trust fund, to be resorted to by corporate creditors, in the absence of other corporate property.

The fact appears to be that prior to the time the plaintiff's

claim accrued against the railway company the company had already become indebted to a certain construction company, in which Traer and George Greene were large stockholders. This indebtedness, it is shown, amounted to seventy thousand dollars, and was more, as we infer, than the company could easily discharge by a cash payment. But what the circumstances of the company were it is not important to inquire, because the question as to whether it was rich or poor is wholly foreign to the legal question presented for our determination.

Whatever were the circumstances of the debtor railway company, it offered to issue to the construction company stock of the par value of three hundred and fifty thousand dollars in discharge of the seventy thousand dollars of indebtedness. This offer was accepted, and the stock was issued accordingly; and, having been issued, it was distributed at once among the stockholders in proportion to their respective interests as stockholders in the claim of seventy thousand dollars; and Traer received one hundred and forty shares, and George Greene nine hundred and ten shares. The resolution under which the stock was issued is in these words: "Resolved that, in the adjustment and liquidation of claims against the company, the treasurer be authorized to use the stock of the company, provided, not less than twenty per cent of the par value can be realized for the purpose." Certificates of stock appear to have been issued to Traer and George Greene in the ordinary way. What, if anything, they showed, or what, if anything, the books of the company showed, in regard to the payment for the stock, does not appear. The company seems to have proceeded upon the theory that stock which had never been issued had a substantial existence as an asset of the company, as stock would have which had been issued and paid for, and afterwards acquired by the company.

But this was, in fact, a new issue, and, being such, the books should have shown twenty per cent paid, and only that, whatever might have been the understanding as to whether the

remaining eighty per cent should be called for or not. Possibly the books do show the transaction as it was, but it is not important as to whether they do or not. The question is as to whether the defendants can be sustained upon any theory of the transaction which they have propounded.

Precisely what their theory is, it is not easy to state, because it does not seem to be very well defined. Sometimes they seem to rely upon the rule, recognized in some cases, that, where a subscriber to stock pays for it in property at an over estimated, but honestly estimated, value, a court will not go behind the transaction. We are not asked in words to say that the defendant and the railway company might have honestly estimated twenty cents to be worth one hundred cents, but, unless we could say that, it is manifest that the principle enunciated has no application. We think it safe to say that there was never any pretense, honest or dishonest, that this stock was really fully paid. There might have been an understanding that dividends should be made upon it to the same amount as upon other stock which was fully paid, and also an understanding that the remaining eighty per cent should not be called for. We think that this was the understanding in fact. We do not suppose that it was expressed in so many words. The parties seem to have misconceived the nature of unissued stock. But if the defendants can escape liability, it must be because there was virtually an agreement that the remaining eighty per cent should not be called for. The question then arises as to whether stockholders can be allowed to set up such an agreement to enable themselves to escape the liability which the statute contemplates. In our opinion they cannot. The theory of the statute is that the amount of stock issued constitutes the basis of the company's credit. It is not absolutely necessary that more than a small per cent shall be paid upon the issued stock. It is not desirable that it should be paid for faster than the actual needs of the company require. The balance constitutes a reserved fund, to be called in at stated times and in successive installments, or in the dis-

cretion of the managing officers. But, however the same may be called in, provision therefor must be made in the articles of incorporation, and notice of the provision must be published to the world, that persons having occasion to deal with the company may do so intelligently. The corporate books should show the amount of stock issued, and who the holders of the stock are, and the amount paid. Code, § 1078. Any rule which should have the effect to enable incorporated companies to make a show of capital and responsibility which they do not in fact possess, and thereby invite credit to which they are not entitled, would work untold mischief. Such a rule would not only tend to enable irresponsible corporations to entrap the unwary, but would tend to impair the credit of responsible corporations. Whenever it comes to be understood that it is legal for a corporation to do business upon a fictitious basis, suspicion will necessarily fasten to some extent upon all corporations. The statute provides that the amount of capital stock subscribed, and the amount of capital actually paid in, must be kept posted in the principal place of business, and be subject to public inspection. Code, § 1077. It also provides that an execution against the company may be levied upon the private property of stockholders to the amount of that portion of their stock which remains unpaid. Code, § 1082. If a corporation can legally issue stock as fully paid, which is not fully paid, or, what is the same thing in effect, receive part payment, and issue the stock with an agreement that the balance shall never be called for, then the posted statement, when stock is so issued, would, though conforming to the law, be utterly deceptive upon one point. The statute assumes that the public is entitled to know, not only how much capital has been actually paid in, but how much has been subscribed. But, under the rule contended for, subscriptions to stock beyond what is actually paid in cannot be relied upon, because there may be a secret agreement having the effect to nullify what would otherwise be the stockholder's legal obli-

gation.   We cannot think that the law provides for a posted statement to serve as a guide to the public, and at the same time provides that the statement may contain a substantial falsehood upon a material point.   It is not important to inquire what posted statement was made in relation to the stock in question, whether it showed the stock fully paid, or one-fifth paid, as the fact really was.   The posted statement could not affect the defendants' liability.   But it is manifest that, if it is lawful to issue stock as fully paid when it is not fully paid, or with an agreement that full payment shall not be called for, and stock is so issued, then the posted statement should show the specific agreement.   But, as no such showing is provided for, we conclude that such agreement is not contemplated, and is not, therefore, to be regarded as allowable.

The true rule undoubtedly is that shares should be paid for in full, or be subject to be paid for in full, either in money, or in property the value of which is estimated in good faith to be equal to the par value of the shares.   Whoever subscribes for stock in an incorporated company has a right to assume that all subscribers, whether prior or subsequent, become such upon substantially the same basis.   The statute requires that the articles of incorporation shall show definitely the amount of capital stock authorized.   This is important for several reasons.   Subscribers have a right to judge for themselves whether the amount authorized will be sufficient for the successful prosecution of the business.   Creditors also have the same rights.   But, if the rule shall be adopted that directors may issue stock upon the receipt of any sum, no matter how small, and provide that the stock shall be treated as fully paid, or, what is the same thing, that the remainder of the par value shall never be called for, no person could safely subscribe for stock in an incorporated company.   However well conceived the enterprise might be, and however judiciously the company might be organized, it would involve nothing but peril, if the directors at their pleasure can be allowed to fritter away the authorized capital of the company, and cur-

tail its resourses in the mode in question. In Green's Brice's Ultra Vires, 143, the author says: "The sale of stock in a corporation by the directors at a less rate than the price fixed by the charter is a fraud upon the law and upon the stockholders." Citing *Sturges v. Stetson*, 1 Biss., 246; *Fosdick v. Sturges*, Id., 255; *Mann v. Cooke*, 20 Conn., 178; *Fisk v. R. R. Co.*, 53 Barb., 513; *O'Brien v. Same*, Id., 568. In Taylor on Corporations, section 545, the author, speaking of payment for stock in property, says: "If the property received is grossly unequal in value to the par value of the shares, the subscriber who received the shares originally, or· his subsequent transferee with notice of the circumstances, may be compelled to make up the difference in value, in a suit brought by or on behalf of the persons injured thereby," citing *Bailey v. Pittsburg & Connellsville Gas, Coal & Coke Co.*, 69 Pa. St., 334; *Boynton v. Hatch*, 47 N. Y., 225; *Tallmadge v. Fishkill Iron Co.*, 4 Barb., 382. The same doctrine was held by this court in *Osgood & Moss v. King*, 42 Iowa, 478. Property known to be less than the par value of the stock was received in full payment. This court condemned the transaction. Mr. Justice DAY, in the opinion, said: "The intention of the law is, that property or a fund equal to the capital stock of the company, or so much of it as the articles of incorporation require to be subscribed previous to commencing business, shall, in fact, exist, and. be subject to the debts of the corporation." The case at bar, in our opinion, is not different in any material respect. If the officers of a company cannot be allowed to receive in full payment for stock property known to be of less value than the par value of the stock, it requires no demonstration to show that they cannot be allowed to receive in money less than the par value. The case at bar differs only in this, that the value of what was received was certain, and did not need to be established by evidence.

It should be observed that the agreement that the remaining eighty per cent should not be called for was not an agree-

ment to which all the stockholders of the railway company were parties. Had it been, there would be more ground for contending that the agreement was valid, and some support might be found in the English decisions for such position. But, even if such had been the case, the defendant's position could not be supported by the decisions in this country. In *Scovill v. Thayer*, 105 U. S., 143, stock had been issued to all the stockholders, with an understanding on the part of all, that only ten cents on a dollar should be called for. WOOD, J., after referring to the English decisions, says: "But the doctrine of this court is that such a contract, though binding on the company, is a fraud in law on its creditors, which they can set aside; that, when their rights intervene, and their claims are to be satisfied, the stockholders can be required to pay their stock in full." In *Union Mut. Life Ins. Co. v. Frear Stone Man'f Co.*, 97 Ill., 537, a similar doctrine was held. The court said: "The secret agreement of the shareholders in this case must be regarded as void, certainly as to creditors of the corporation without notice." In *Rider v. Morrison*, 54 Md., 429, the directors had undertaken to release a subscriber from his unpaid subscription, but the court held that unpaid subscription to the stock of a corporation is a trust fund, to be held by the corporation for the benefit of creditors, and that the directors had no power to release a subscriber to the prejudice of creditors. In *Jewell v. Rock River Paper Co.*, 101 Ill., 57, there was a private understanding with some of the stockholders at the time of their subscription that full payment should not be called for. It was held that such private understanding could not be sustained. In *Wetherbee v. Baker*, 35 N. J. Eq., 501, it was held that the officers of a corporation are the trustees of its subscriptions to its stock, and hold them as a trust fund, and that the trust cannot be defeated by any device short of actual payment in good faith. In *Crawford v. Rohrer*, 59 Md., 599, it was held that any arrangement among stockholders by which stock is but nominally paid for, whether in money

or property, will not be regarded as a valid payment as against creditors. In *Kehlor v. Lademann*, 11 Mo. App., 550, it was held that, while stock might be issued to a creditor in payment of indebtedness, and issued as full paid stock, yet, if it was issued for less that its par value, a creditor could recover the difference. In Morawetz on Corporations, section 374, the author says: "The issue of paid up shares at less than their par value is not alone a fraud upon the creditors; it is a fraud upon every member who has contributed his full proportion," citing the same cases cited in Green's Brice's Ultra Vires. Again, the same author says, in section 589: "The law is settled that every device by which the stockholders of a corporation seek to discharge themselves from liability to pay their stock subscriptions in full will be treated as a fraud upon creditors, and may be set aside if the company should afterwards become insolvent. Thus it has been held that a release executed by a corporation to its stockholders, or simulated payment of the stock subscriptions and return of the money to the subscribers in the shape of a loan, will not be allowed to defeat the just expectations of creditors; and a resolution that the shares issued by a corporation shall be deemed paid up shares, although unanimously adopted in a corporate meeting, is equally insufficient to effect its purpose;" citing *Upton v. Tribilcock*, 91 U. S., 45; *Upton v. Hansbrough*, 3 Biss., 417; *Sawyer v. Hoag*, 17 Wall., 610; *Slee v. Bloom*, 19 Johns., 456; *Sagory v. Dubois*, 3 Sand'f. Ch., 466; *Osgood v. King*, 42 Iowa, 478; *Burnham v. N. W. Ins. Co.*, 36 Id., 632; *Mann v. Cooke*, 20 Conn., 178; *Pickering v. Templeton*, 2 Mo. App., 424; *Skrainka v. Allen*, 7 Id., 434; *Chouteau v. Dean*, Id., 210; *Gill v. Balis*, 72 Mo., 424; *Woodfork v. Union Bank*, 3 Coldw., 488.

It is contended, however, that it does not appear that George Greene and Traer became stockholders in pursuance of any subscription to the stock, and that the authorities respecting the liability of stockholders to pay in full for stock are for this reason not applicable.

It may be conceded that it does not appear that these stock-holders entered into a written contract of subscription. It seems probable that they became stockholders simply by the acceptance of the stock, in question. That a person may become a stockholder in this way is not denied, and could not be properly. The question presented, then, is, as to what are the liabilities of a stockholder who becomes such without any subscription. Does he, by reason simply of the acceptance of stock, become liable to pay for it the price fixed therefor in the articles of incorporation? In our opinion he does. The principle involved has been repeatedly decided. See *Nulton v. Clayton*, 54 Iowa, 425. In that case it did not appear that there was any express promise by the defendant to pay for the stock, but this court held that he could not, for that reason, escape liability; following *Spear v. Crawford*, 14 Wend., 20; *Hartford & New Haven R. Co. v. Kennedy*, 12 Conn., 499; *Renssellaer & N. W. Plank R. Co. v. Barton*, 16 N. Y., 457; *Small v. Herkimer Manufacturing Co.*, 2 N. Y., 330; *Dayton v. Borst*, 31 Id., 435; *Hartford & New Haven R. Co. v. Croswell*, 5 Hill, 383. The doctrine of the cases is, that the liability to pay for stock the price fixed by the articles of incorporation does not necessarily exist by express contract, but may arise by implication of law out of the mere relation of stockholder.

It is probably true that, if no stock has been issued to, and accepted by, the person sought to be charged, there should be, in order to bind him, a written subscription. *Pittsburgh & Connellsville R. Co. v. Clarke*, 29 Pa. St., 146. But that need be only an agreement to *take* stock and need not contain any promise to pay for it. See authorities above cited. An agreement to take stock, when in writing and accepted by the company, creates the relation of stockholder. The issuance of a certificate in such case is not necessary. See Taylor on Corporations, section 511, and authorities cited. But where the person sought to be charged has already taken the stock by an acceptance of certificates, the necessity for a written agree-

ment to take stock is superseded. The relation of stockholder exists beyond controversy. Whenever this relation exists, the law determines the rights and liabilities of the stockholders. We have seen no case which recognizes a difference between those stockholders who become such in pursuance of a written agreement, and those who become such by the mere acceptance of stock issued to them. To hold, then, that where there is an agreement in writing to take stock, even though it is not taken, it must be paid for as contemplated in the articles of incorporation, and that it need not be thus paid for if taken without such agreement, would be to make a distinction for which we find no warrant in the decisions, and for which there is certainly none in principle.

It is undisputed that a mere transferee of stock not fully paid becomes liable to pay the balance, unless the stock has been issued as fully paid, and he has acquired the same in ignorance that it was not fully paid in fact. The liability of a transferee does not arise by reason of an express contract with the company. His liability is imposed by law, as arising by implication out of the relation of stockholder. It would be strange if there were not the same implication where a person takes stock directly from the company, though he does so only by oral agreement. He is not the less a stockholder, and is not entitled to less rights as a stockholder. There is no reason why his rights should be disproportionately greater than his burdens.

No one, we think, in this state, thus far, when desiring to estimate the responsibility of a corporation, has thought of inquiring further in respect to its issued stock than was necessary to ascertain the amount issued. If we should hold the rule contended for, the amount of stock issued would not of itself furnish any indication in regard to the responsibility of the company. Whoever should desire to estimate the responsibility of a given corporation would need to ascertain all the agreements, written and oral, open and secret, under which the stock had been issued.

We are aware that a corporation which commences to incur the hazards of business with its stock only partly taken, may find itself in a condition which would render it impossible for it to dispose of its stock at par. Whenever a corporation enters upon business which its resources do not justify, it is guilty of an irregularity. But that is no reason why it should be allowed to relieve itself by perpetrating another irregularity, and one which the law denominates a fraud.

The true theory is that the capital stock of a corporation is fixed with reference to its supposed largest needs, to be all subscribed, and to be paid for in cash at once, or to be called in from time to time, in successive installments, as the actual needs of the corporation may require. Whenever a corporation has imprudently commenced business, and incurred hazards, with a partial and insufficient amount of stock taken, and can dispose of no more stock at par, such corporation is ordinarily a source of danger to the public, and, when such, the sooner it is wound up the better. The courts certainly should not aid it to prolong its existence by methods which the statute does not contemplate.

The defendants rely upon *Phelan v. Hazard*, 5 Dill., 45. But that is not a case where stock had been issued as fully paid, when there was no pretense that it had been fully paid in fact. Property had been taken in payment, and, as we infer, as a payment of the full par value. The court refused to presume fraud, and said: "While the contract stands unimpeached, the court, even where the rights of creditors are involved, will treat that as payment which the parties have agreed should be payment." But in the case at bar the contract does not stand unimpeached, unless twenty cents can honestly be estimated as worth one hundred cents, or unless stock can be issued as fully paid when there is no pretense that it is fully paid in fact. Some other cases are cited by the defendants, most of which fall substantially under the rule in *Phelan v. Hazard*, and have no application to the case at bar.

The case of *New Albany v. Burke*, 11 Wall., 96, has been cited, but we have to say; upon a careful examination of the case, that we do not discover anything in it which appears to us to be inconsistent with the view which we have expressed.

The case of *Van Cott v. Van Brunt*, 82 N. Y., 535, might, upon a cursory examination, be thought to support the defendant's position, and we have to say that it would seem that it does, if it holds what is claimed for it, and what some text writers seem to think that it does. But the opinion is not clear. There are expressions in it which indicate strongly that the stock was not issued as fully paid. If it was not, then the decision has no application as authority in the case at bar. One of the expressions referred to is in these words: "In view of the facts presented, no sufficient reason appears, why the stock held by Van Brunt, and not subscribed by him, should be treated and regarded as full paid up stock. It was evidently intended by the parties that it should not." But, conceding that the case holds what the defendants claim that it does, we do not think, in view of our statute, that we should be justified in following it. Besides, we observe that the correctness of the opinion has not passed unchallenged. In Morawetz on Corporations, section 589, note, the author, assuming that the case holds that stock may be issued as fully paid for less than its par value, says: "It is submitted that this decision is supported neither by reason nor authority."

One position taken by the defendants remains to be noticed, and that is, that the stock issued as fully paid was entirely worthless. In our opinion the worthlessness of the stock would not enable the defendants to escape the statutory liability. If the stock was worthless, as the defendants claim, there was so much the greater reason why the stockholders should not hold themselves out under false pretenses. If the stock was worthless, and the contract by which it was issued was based upon that theory, as we understand the defendants' counsel to claim, it seems to us that the conduct of Traer and Greene was without a shadow of excuse. They must have

had a motive altogether independent of the value of the stock, and it is difficult to see how that motive could have been other than a corrupt one.

They were directors, it appears, in the railway company. Immediately upon the issue of the $350,000 of stock, they proceeded to make a transfer to John I. Blair, to induce him to become the president of the company, by giving him a controlling interest. Now, if the company was insolvent and the stock worthless, as the defendants claim, the plan must, we think, have been, to put a mere semblance of life into the company, and invite credit to which they knew it was not entitled. We know, indeed, that the company did invite credit to which it was not entitled, and that one of the persons who became creditors was this plaintiff.

We trust the motives of Traer and Greene were more honorable than they would seem to be upon the theory of the defendants' counsel. We are inclined to think that they regarded the stock as of some value, and hoped, too, that the company would be able to pay its debts, and that something would be saved to themselves beyond such debts. With this view, it is only necessary for us to say that the stock which they agreed should be treated as fully paid cannot be so treated in a proceeding by creditors, under the statute, to enforce a liability for the unpaid balance. We think that the opinion heretofore filed should not be adhered to, and that the judgment below must be

AFFIRMED.

ROTHROCK, CH. J.—*dissenting.* I believe the foregoing opinion to be radically and fundamentally wrong, and for that reason I cannot allow it to pass without expressing my dissent. The opinion on the original submission of the cause was concurred in by four members of the court; and, although it is true that the case has been elaborately argued upon the rehearing, there has not been a single additional reason adduced why the decision should be other than that

already given in the opinion heretofore filed. I say this with all the printed arguments before me, and, to show that I am correct in the statement, I quote from the original opinion as follows:

"As we understand the position of counsel for plaintiffs, they concede that a corporation may, as between itself and one to whom it is indebted, make a valid disposition of its stock, and issue full-paid certificates of stock for such consideration as may be agreed upon by the contracting parties. But it is claimed this cannot be done to the prejudice of the creditors of the corporation, and it is urged that the mere showing that the stock held by defendants was issued to them in payment of a debt due them at the rate of twenty cents on the dollar renders the defendants liable to the creditors for the remaining eighty cents on the dollar. On the other hand, it is contended by counsel for defendants that, in the absence of fraud, such a transaction is valid between the parties, and, if entered into in good faith, cannot be impeached by creditors of the corporation.

"In the case of *Phelan v. Hazard*, 5 Dill., 45, the parties were the owners of a tract of land supposed to be mining property. The land was incumbered by certain mortgages. Rowland G. Hazard, one of the owners, was the holder of one of these mortgages. Articles of incorporation were adopted by the owners, and the property was conveyed to the corporation, for which it issued to the owners certain shares of full-paid stock. Rowland G. Hazard afterwards transferred his stock to the defendant. Afterwards the corporation made its promissory notes to the plaintiff's assignor, and the action was brought to recover the amount due on the promissory notes, upon the ground that the stock had never been paid for, and defendant, under the statutes of Missouri, was liable for the plaintiff's debt to the extent of the par value of the stock. The answer denied that the shares had not been paid up in full, and averred that the record and books of the company

showed that they were fully paid, on the faith of which defendant purchased the stock.  It appears that under the statute of Missouri a creditor of a corporation may maintain an action against a stockholder after a dissolution of the corporation.  It was not charged in that case that there was any fraud in the original transaction.  It was held that unless the transaction is impeached for fraud it is valid, and that this cannot be done unless the attack is directly made.  The court said: 'The cases are numerous wherein such transactions as that which was entered into in this instance between the owners of the mining property and the corporation which they formed have come before the courts, and, in the absence of fraud, have been sustained.'  It is further said: 'The following proposition is fully sustained by the authorities: That the contract is valid and binding upon the corporation and the original share-takers, unless it is rescinded or set aside for fraud; and that, while the contract stands unimpeached, the courts, even where the rights of creditors are involved, will treat *that* as payment which the parties have agreed should be payment.'

"In the case of *New Albany v. Burke*, 11 Wall., 96, a city subscribed to the capital stock of a corporation, payment therefor to be made in bonds of the city.  A part of the bonds were delivered to the corporation, and afterwards, by an agreement between the corporation and the city, the bonds were surrendered and the stock subscription was canceled.  The action was brought against the city by a creditor of the corporation, in which it was alleged that the settlement and compromise between the city and the corporation was illegal.  It was held that, as both the city and the corporation acted in entire good faith, and did that which, under the facts of the case, was for the interest of both, no recovery could be had of the city.

"It is a general principle, well established by authority, that the subscribed capital stock of a corporation is a fund held by it in trust for its creditors, and any release of payment in

full for stock subscribed is ordinarily a fraud upon the creditors of the corporation. While this is the rule, it is apparent that it can have no application to a case where it is shown that the transaction complained of is untainted with fraud, and entered into and carried out in good faith by the contracting parties, and without prejudice to creditors.

"The case of *Osgood v. King*, 42 Iowa, 478, is relied upon by counsel for plaintiff as sustaining the right of recovery in this case. In that case it was charged in the petition that certain parties, including the defendant, organized and incorporated a coal company, and that at the time of the incorporation, and before any other party had any interest in said corporation, the said incorporators, including King, the defendant, conveyed certain lands to the corporation, and issued to themselves certificates of stock for 1,900 shares of $100 each; that the land conveyed was not worth more than $27,500, and would not make payment of more than $14 per share for the stock issued. Recovery was sought as against the defendant, one of said stockholders. The defendant demurred to the petition, and it was held that the demurrer should have been overruled, upon the ground that the transaction, as shown by the averments of the petition, was a gross fraud upon the creditors of the corporation. If the defendant had answered, and upon the trial made it appear, that the transaction was entered into in good faith, and that it did not operate as a fraud upon creditors, it is not to be supposed that the ruling would have been different in that case from the authorities above cited.

"In the case at bar the defendants answered, and a trial was had upon evidence introduced in court, from which it appears that the Burlington, Cedar Rapids & Minnesota Railroad Company was hopelessly bankrupt as early as 1871. On the seventh day of February of that year, the company adopted a resolution, which was in these words: 'Resolved that, in the adjustment and liquidation of claims against the company, the treasurer be authorized to use the stock of the company, provided not less than twenty per cent of the par value can be

realized for the purpose.' The auditor of the railroad company testified as follows: 'I am positive that the way the construction company came to receive the 3,500 shares of the stock of the railway company was this: Certain payments were to be made to it in *cash*, and the shares were given in payment under the resolution referred to. The railway company was entirely unable to pay $70,000 in cash, and the stock had to take the place of the cash payment. They were reluctant to take the stock. The transaction was made at the instance of Judge Greene. The stock was not worth anything in the market. The road owed a floating debt of $500,000. We had no way of paying except by its earnings and its stock, and by borrowing. *     *     *' This testimony is not contradicted, and its truth must be conceded. It further appears that the mortgages upon the road were foreclosed, and its property was purchased by the mortgage bondholders, and the new company was organized. It is not claimed that the stock in question had. at the time it was issued to the defendants, or afterwards, any value whatever, and, of course, the foreclosure of the mortgage extinguished the stock.

"Now, under this state of facts, if we were to hold the defendants liable to the plaintiffs for eighty cents on the dollar of the stock which was issued to them, it would be grossly unjust. This stock was not issued in pursuance of an original stock subscription. It was issued in pursuance of the above resolution entered upon the records of the corporation. These defendants were creditors, and they took·stock under that resolution because they could get nothing else. The stock was then worthless, and so remained, and no creditor would have been defrauded if an unlimited amount of it had been issued.

"The plaintiffs, in effect, demand that because defendants took this worthless stock they are liable to pay the debts due from the corporation to the other creditors. This would be grossly inequitable, and we know of no rule of law requiring us to so hold. It appears that George Greene was president

of the Burlington, Cedar Rapids & Minnesota Railroad Company at the time this stock was issued, and both he and Traer were stockholders, and members of the construction company, and officers therein. These facts are alluded to in argument. But a stockholder or a director of a corporation may deal with the corporation, and the law will protect him as well as any other party. His relation to the corporation goes only to the question of the good faith of the transaction. *Smith v. Skeary*, 47 Conn., 47. We think the facts in this case fully rebut the presumption of fraud which attaches in transactions of that kind, and that the court should have rendered a judgment against the plaintiff for costs."

It will be seen from the foregoing quotation that no question is made as to the general rule, that the sale of stock in a corporation by the directors for less than the price fixed by the charter is unauthorized, and the stockholder is liable for the unpaid balance. Or, repeating the quotation from Morawetz, found in the foregoing opinion: "The law is well settled that every device by which the stockholders of a corporation seek to discharge themselves from liability to pay their stock subscriptions in full, will be treated as a fraud upon creditors, and may be set aside, if the company should afterwards become insolvent;" or as expressed in Taylor on Corporations: "If the property received is grossly unequal in value to the par value of the shares, the subscriber who received the shares originally, or his subsequent transferee with notice of the circumstances, may be compelled to make up the difference in value, in a suit by or on behalf of the persons injured thereby."

Now, why it is necessary for this court to elaborate and cite authority after authority to support so plain a proposition, is more than I can imagine. The principle is not denied by any counsel in argument in this case, and was not denied in the original opinion, but directly recognized.

But the majority of the court ignore the question as to the right of a person found in the possession of shares of stock,

which have not been fully paid, to show that he did not acquire the same as a stock subscriber, and that the transaction by which the stock was issued to him was not a dishonest device, and was not prejudicial as to any one, and that no creditor or stockholder of the company was or could be defrauded thereby. The evidence shows beyond question that the stock was absolutely worthless, and that the company was hopelessly bankrupt, and had no means to pay the debt due to the construction company, and that the stock was taken because of that fact. In the face of this evidence, it is said in the majority opinion that the seventy thousand dollars of debt "was more, as we infer, than the company could easily discharge by a cash payment;" and that "there might have been an understanding that dividends should be made upon it as upon other stock, and that the remaining eighty per cent should not be called for; and that Greene and Traer may have had corrupt motives in taking the stock, and that they may have regarded the stock as of some value, and hoped that the company would be able to pay its debts. "All the fear and apprehension expressed in the opinion as to the peril of creditors and other stockholders is completely answered by the undisputed facts in the case. The thought of the opinion, and, indeed, the only ground upon which it can be based, under the conceded facts, is that, where a person who is a creditor takes payment of a debt in shares of stock in a corporation which is bankrupt and insolvent, and has nothing else to pay with, and the stock is worthless, and the face of the shares amounts to more than the debt, he must pay the difference to the other creditors of the corporation. In other words, the opinion holds that the transaction is conclusively presumed to be fraudulent, and the holder of the stock cannot be allowed to show that it was not a fraudulent device, and that the creditors were not in any manner prejudiced thereby. I feel warranted in saying that no court has ever held any such doctrine. I concede, and in the investigation of this case always have conceded, that it is incumbent on the person to

whom the stock is issued to show the good faith of the transaction, and that no one was prejudiced thereby. With due deference to the majority, I think the case of *Van Cott v. Van Brunt*, 82 N. Y., 535, is precisely in point. I quote from the head note of the case, which is a fair statement of the question decided.

"Defendant, V. B., being the president and director of the H. A. R. R., as such president entered into a contract with C., by which the latter agreed to build and equip a portion of the road, for a certain sum in stock of the company, and for a certain sum in its bonds. Immediately afterward, and in accordance with a previous arrangement, the contract was assigned by C. to V. B., who, with others associated with him, performed the contract at an expense less than the par of the stock and bonds agreed to be paid therefor, which they received. In an action by plaintiff, among other things, to recover of V. B., as the amount unpaid upon the stock, a proportionate share of the difference between the par value of the stock so transferred and the cost of performance, it appeared that the contract was entered into and assignment made in good faith, after full deliberation and consultation, with the knowledge and assent of all the directors and stockholders of the company, as the only means to insure the construction of the road, and that the amount expended exceeded the actual value of the stock and bonds delivered in payment. *Held* that the stock so transferred was to be considered as full paid-up stock, and that the action was not maintainable."

I have written more than I intended to write, and would not have written anything if it were not for an abiding conviction that the majority opinion is radically wrong in holding, as it does, that the defendants are conclusively presumed to be liable. Their right to be heard ought not, in my judgment, to be denied by such a proposition as that twenty cents are not worth one hundred cents.

If a laborer on the railroad at one dollar and twenty cents a day had received for his month's pay one hundred dollars

of this worthless stock, because he could get nothing else, according to the above opinion, the Louisa County National Bank, another creditor, could recover of him the difference between the amount of his wages and the hundred dollars, upon the principle that twenty cents are not worth one hundred cents, and his mouth would be closed against showing his good faith, and that the bank was not prejudiced. And the decision would be a solemn determination that, by thus taking payment, he was a party to a fraudulent transaction to the prejudice of the bank.

SEEVERS, J., concurs in this dissent.