BABBITT v. READ et al.

(District Court, S. D. New York. April 16, 1914.)

**1. COURTS (§ 366*)—FEDERAL COURTS—STATE LAWS AS RULES OF DECISION.**

Where the constitutional and statutory law of the state in which a corporation was incorporated respecting the liability of stockholders, at the time of such incorporation had been clearly and definitely construed and settled by the decisions of the highest court of the state, it will be followed by a federal court in determining the liability of stockholders of such corporation.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 954–957, 960–968; Dec. Dig. § 366.*]

**2. CORPORATIONS (§ 232*)—LIABILITY OF STOCKHOLDERS—STOCK ISSUED FOR PROPERTY—MISSOURI STATUTE.**

Under Const. Mo. art. 12, § 8, which provides that "no corporation shall issue stock or bonds except for money paid, labor done, or property actually received," and Rev. St. Mo. 1899, § 962 (Rev. St. 1909, § 2981), which contains the same provision, as construed by the Supreme Court of the state, where a corporation issues stock in payment for property, the property must be the fair equivalent in value of the par value of the stock issued therefor, otherwise the stockholder receiving it is liable to creditors who became such without knowledge of the fact, for the difference, whether he was guilty of actual fraud or acted in good faith; and as a creditor in dealing with the corporation had the right to rely on its having the full amount of its capital stock in money, or its equivalent value, in a suit to enforce such liability of a stockholder, the burden rests on the defendant to prove that plaintiff knew that it did not.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 686; Dec. Dig. § 232.*]

**3. BANKRUPTCY (§§ 145, 282*) — LIABILITY OF STOCKHOLDERS — ASSETS — ENFORCEMENT BY TRUSTEE.**

Such liability, being as for an unpaid stock subscription, is an asset of the corporation, and may be enforced by its trustee in bankruptcy for the benefit of its creditors.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 205, 230–232, 234; Dec. Dig. §§ 145, 282.*]

**4. CORPORATIONS (§ 240*)—RIGHTS OF BONDHOLDERS—ENFORCEMENT OF STATUTORY LIABILITY OF STOCKHOLDERS—"NO RECOURSE" CLAUSE.**

Bonds issued by a corporation recited that they were secured by mortgage, and contained a clause, stating that they were subject to all the provisions of such mortgage. The mortgage contained a provision that "no recourse under any obligation of this mortgage or of any bond or coupon hereby secured shall be had against any * * * stockholder * * * either directly or through the company by the enforcement of any right or claim, statutory or otherwise; * * * it being expressly agreed and understood that this mortgage and the bonds secured hereby are solely corporate obligations." *Held,* that such provisions, having been inserted in good faith, and not as part of a scheme to defraud, were valid and

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

binding on purchasers of the bonds, and that bondholders could not en-
force a statutory liability imposed on certain of the stockholders for the
benefit of general creditors of the corporation because of their having re-
ceived their stock in payment for property transferred to the corpora-
tion at an overvaluation.

· [Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 688, 692, 693,
697–699; Dec. Dig. § 240.*]

5. CORPORATIONS (§ 244*) — LIABILITY OF STOCKHOLDERS — LIABILITY AS FOR
   UNPAID SUBSCRIPTIONS—BONA FIDE PURCHASERS.
      Bona fide purchasers of stock of a corporation from the original sub-
   scribers or their transferees, without notice that it was illegally issued
   in payment for property bought at an overvaluation, are not subject to a
   statutory liability imposed on the original holders because of such fact,
   as for unpaid subscriptions; nor are they charged with notice by the
   fact that they received the stock as a bonus with a purchase of bonds of
   the corporation.

      [Ed. Note.—For other cases, see Corporations, Cent. Dig. § 710; Dec.
   Dig. § 244.*]

In Equity. Suit by Byron F. Babbitt, trustee in bankruptcy of the
Randolph-Macon Coal Company, against William A. Read and others.
Decree for complainant as to part of his claim against certain defend-
ants, and for the remaining defendants.

Hornblower, Miller & Potter, of New York City (Charles A. Bos-
ton, of New York City, and P. Taylor Bryan, of St. Louis, Mo., of
counsel), for plaintiff.

Strong & Cadwalader and Rushmore, Bisbee & Stern, all of New
York City (Charles E. Rushmore and George N. Hamlin, both of
New York City, of counsel), for defendant Read.

William J. Patterson, of New York City, for defendant Van Brunt.
Carter, Ledyard & Milburn, of New York City, for defendants Metro-
politan Life Ins. Co., Hegeman, and Hamilton Trust Co.

Harris, Corwin, Gunnison & Meyers, of New York City, for de-
fendants Home Trust Co., Brown, and Furness.

Montgomery & Peabody, of New York City, for defendant Teget-
hoff.

MAYER, District Judge. On May 10, 1907, Mr. Babbitt was duly
appointed trustee in bankruptcy of the Randolph-Macon Coal Com-
pany, a corporation organized under the laws of Missouri, for the pur-
pose of acquiring and operating coal mines and selling coal. · The
claims originally proved in bankruptcy aggregated $2,376,041.43 of
which $2,149,729.45 represented a deficiency judgment entered in a
suit brought by the Central Trust Company of New York as trustee to
foreclose a mortgage given to secure an issue of $3,000,000 of bonds.
Pursuant to an order of authorization made by the referee in bank-
ruptcy, the trustee brought this suit in April, 1909, against these de-
fendants, who are some, but not all, of the stockholders of the bank-
rupt company, to recover, upon the theory of a stockholder's liability
for unpaid subscriptions, an amount equal to the capital stock of the
company, to wit, $5,000,000 "or so much thereof as may be necessary

for the full payment of all the debts proved and allowed in bankruptcy" against the bankrupt estate, together with cost of collection.

Briefly stated, the plaintiff contends that the Randolph-Macon Coal Company issued its capital stock of $5,000,000 and its bonds to the extent of $1,800,000 for the purchase of property which, it is alleged, did not exceed in value the sum of $1,620,000; that the original so-called subscribers to the entire issue of the stock of the company, who were also the incorporators, paid therefor by the sale and transfer to the company of the property in question, and that in so doing they were acting as the agents of the defendants Read, Gardiner (now executors of Gardiner), and Van Brunt, and that, in view of all of the facts and circumstances hereinafter outlined, these defendants are liable as for unpaid subscriptions. The bill further alleges (paragraph thirty-sixth) that the defendants Seaman, Clark, Metropolitan Life Insurance Co., Hegeman, Gardiner as trustee, and Read as trustee, acquired their shares of stock with full knowledge that the stock was not fully paid, and that Seaman, Clark, Metropolitan Life Insurance Company, and Hegeman are each severally liable for the full amount of shares of stock, severally held by each of them, or so much thereof as may be necessary for the full payment of debts, etc., and that these defendants are jointly and severally liable with Read, Gardiner, Van Brunt, and Kobusch, for the full amount of the par value of the shares of stock standing, respectively, in each of their names, or for so much thereof as may be necessary for the full payment of debts, etc. The trustee sets forth in the bill that he cannot state whether or not the defendants the Home Trust Company, the Hamilton Trust Company, and Tegethoff acquired the shares of stock severally standing in their respective names, with knowledge or notice that the same was not fully paid; but he avers that, if any of these three defendants acquired the stock with knowledge that the amount subscribed therefor was not fully paid, then that they are liable. Substantially the same allegation was made in regard to defendants James N. Brown and Harry P. Furness. George J. Kobusch was not made a party to the suit. James T. Gardiner died after the suit was commenced. After the suit had been at issue and considerable testimony had been taken (and subsequent to the decision in Mackay v. Randolph-Macon Coal Co., 178 Fed. 881, 102 C. C. A. 115, the trustee filed a supplemental bill, including as creditors entitled to representation in the suit certain holders of bonds of the company aggregating $353,000 at par, these being the only bondholders whose claims had been allowed in the bankruptcy proceeding. The theory of the supplemental bill is that the bonds of these holders (called for convenience the Mackay group) were not merged in the foreclosure judgment, but could be established as claims against such portion of the estate in bankruptcy as might be created by a judgment if obtained herein.

For clearness, therefore, it is desirable to consider: First. The questions of fact and law which arise on the issues suggested by the original bill; secondly: (a) Those which are presented because of the partial defense as to the "no recourse" clause in the mortgage set up by defendants Read, Gardiner, Seaman, Clark, Metropolitan Life

Insurance Company, Hegeman, and Hamilton Trust Company; and (b) those which are at issue because of the special position claimed to be held by the owners of the Mackay group bonds.

### The Original Bill.

There is in Randolph and Macon counties in the eastern part of the state of Missouri a large field of bituminous coal. In 1904 this coal, although its existence and extent were well known, had been but little exploited, and there were few mines in operation in this field. The properties, whether consisting of rights or land (not now using the words technically), were held in different ownerships, and from the practical and commercial standpoint the mining had gone on in a comparatively small way. The defendant Van Brunt had been associated with railroad interests in St. Joseph, Mo., and elsewhere, and knew of the existence of this coal territory, and believed that it had great possibilities. He interested George J. Kobusch of St. Louis, Mo., who was then the president of the St. Louis Car Company, and together they acquired 23,000 acres (in round numbers), together with a mine thereon that was then in operation. They organized, under the laws of Missouri, a corporation which was called the Randolph County Coal Mining Company. Believing, however, that the situation warranted the creation and development of an even larger enterprise, Van Brunt and Kobusch, working through agents, procured, from time to time, options for the purchase of a more extensive area, including certain other existing mines. They were two years in acquiring the control, by option and otherwise, of these properties. They realized that such a project needed capital and the co-operation of men of financial ability and standing. Van Brunt was favorably known to the defendant Read, who was a member of the then banking house of Vermilye & Co., of New York City, and in December, 1904, Van Brunt called upon Read and succeeded in attracting Read's interest. Read, however, desired the opinion of some expert of repute. He knew that the old and well-known banking house of Spencer Trask & Co. had frequently been engaged in placing bonds of coal properties in the East, and he asked their aid in procuring the services of the right kind of an expert. Spencer Trask & Co. recommended Mr. James T. Gardiner, who undoubtedly was at that time one of the great coal experts of the country. Read had no previous personal acquaintance with Gardiner, and there is no reason to doubt that the subject-matter was presented to and undertaken by Read in perfect good faith and in the manner in which capable men seek to satisfy themselves as to the merits of a proposed business enterprise. Read requested Gardiner to make a careful examination of the property and its commercial possibilities and to report to him. Gardiner went to Missouri in the early part of January, 1905. He visited the property, inspected such mines as were open and in operation, and, in brief, procured such data and made such study of the situation as would enable him to arrive at a judgment upon which he was willing to rest, and which he was willing to submit to Read. He reported to Read and, in due course, stated his views in writing. Letters of January 11 and 14, 1905. Read consulted his

counsel, and he (Read) and Gardiner agreed with Van Brunt and Kobusch to take part in the proposed enterprise. The understanding between the parties was expressed in two agreements dated January 14, 1905, and known throughout the case as Exhibits 24 and 25, or the Promotion Agreements. These agreements are as follows:

## "Exhibit 24.

"Agreement, made this fourteenth day of January, 1905, by and between W. T. Van Brunt, of the city of New York, and George J. Kobusch, of St. Louis, Missouri, parties of the first part, James T. Gardiner, of the city of New York, party of the second part, and William A. Read, of the city of New York, party of the third part, witnesseth: Whereas, the said Van Brunt and Kobusch have acquired the ownership or control of certain mineral lands and properties in the counties of Randolph, Macon and Howard, state of Missouri, and are desirous of securing the aid of the parties of the second and third part in the organization and development of said properties; now, therefore, it is agreed as follows:

"First.—That there shall be organized under the direction of the party of the third part a corporation under the name of 'Randolph-Macon Coal Company,' or some other appropriate designation, pursuant to the laws of the state of New Jersey, or some other state approved by the said party, having appropriate powers.

"Second.—The said Van Brunt and Kobusch agree to cause to be transferred to the said corporation the following properties, to wit: All the right, title and interest now belonging to Randolph-County Coal and Mining Company, a corporation of the state of Missouri, in and to about twenty-three thousand (23,000) acres of land in the counties of Howard and Randolph, in the state of Missouri, including portions of the surface and coal and other rights under the same, and all improvements thereon; certain coal rights in additional lands adjoining the said property of the Randolph County Coal and Mining Company; all the right, title and interest of the Wabash Coal Company in and to certain property amounting to about two thousand (2,000) acres, near the village of Huntsville, in the county of Randolph, state of Missouri; the options for the purchase of coal rights in about ten thousand acres (10,000) of unimproved land in the county of Randolph, north of Huntsville, at present held by W. E. Murlin; certain coal rights in unimproved lands lying north of the above-mentioned tract and estimated at about five thousand (5,000) acres, so far as the same can be secured by the said Van Brunt and Kobusch, lying in the counties of Randolph and Macon, state of Missouri; all the right, title and interest of a corporation known as Interstate Coal Mining Company in about eleven hundred (1,100) acres of land in the counties of Howard and Randolph, state of Missouri; all the right, title and interest of the corporation known as the Coal Creek Coal & Mercantile Company in and to about fourteen hundred (1,400) acres of land in the counties of Howard and Randolph, state of Missouri; all the right, title and interest of the corporation known as Bolen & Darnell Company in the counties of Randolph and Howard, state of Missouri; all the right, title and interest of the corporation known as Elliott Coal Company in the county of Randolph, state of Missouri, amounting to about fourteen hundred (1,400) acres; all the right, title and interest of the corporation known as Renick Coal Company, in the county of Randolph, state of Missouri; all the right, title and interest of the corporation known as Hollingsworth Coal Company, lying in the county of Randolph, state of Missouri; in consideration of the issue and delivery to the parties of the first part by said corporation of five million dollars ($5,-000,000) par value of its capital stock, being the entire issue of the same; and one million eight hundred thousand dollars ($1,800,000) face value of its first mortgage five per cent., thirty-year gold bonds, out of a total authorized issue of three million dollars ($3,000,000) of said bonds, secured by a mortgage covering all of the above-mentioned properties and such other properties of the company thereafter acquired with the proceeds of the sale of any of

the remaining one million two hundred thousand dollars ($1,200,000) of bonds which shall be reserved for future issue for the purpose of the company, the said mortgage to provide for the creation of a sinking fund of two cents per ton on all coal mined from any of the mortgaged property, and the bonds to be redeemable out of said sinking fund at one hundred and five per cent. (105%) and accrued interest.

"The parties of the first part agree forthwith, upon the organization of said corporation and the transfer to it of the properties and rights aforesaid and the issue and delivery to them of the bonds and stock aforesaid, to transfer and deliver the entire amount of the said stock and bonds unto the party of the third part, to be held and disposed of by him under and pursuant to an agreement bearing even date herewith.

"This agreement is made upon the further understanding and agreement that the party of the second part shall become the president of the corporation so to be organized and shall agree to give his services to the development of the said property in that capacity.

"In witness whereof, the parties have hereunto set their hands and seals in the city of New York the day and year aforesaid."

"W. T. Van Brunt.
"George J. Kobusch.
"James T. Gardiner.
"William A. Read."

"Exhibit 25.

"Agreement, made this fourteenth day of January, 1905, by and between W. T. Van Brunt, of the city of New York, and George J. Kobusch, of St. Louis, Missouri, parties of the first part. James T. Gardiner, of the city of New York, party of the second part, and William A. Read, of the city of New York, party of the third part, witnesseth: Whereas, by an agreement of even date herewith, the said Van Brunt and Kobusch have agreed to cause to be transferred and delivered unto a corporation therein agreed to be formed under the name of 'Randolph-Macon Coal Company,' or some other appropriate name, in consideration of the issue to them of certain first mortgage bonds and certain stock, which bonds and stock, when so issued, are to be transferred and delivered unto the said William A. Read, and the parties hereto desire to make a provision for the disposition of said bonds and stock in the interest of the common enterprise in which they are engaged: Now, therefore, in consideration of the premises, it is hereby agreed as follows:

"The said William A. Read shall receive, hold and deliver the said stock and bonds as hereinafter provided; that is to say, six hundred thousand dollars ($600,000) face value of the said bonds shall be delivered to the said Van Brunt and Kobusch in payment of their actual cash outlays in the acquisition of the properties and options to be transferred to the company by them, as above provided, it being understood and agreed that the said Van Brunt and Kobusch have actually expended the sum of five hundred and twenty thousand dollars ($520,000) in the acquisition of said properties and options up to January 1st, 1905, and they agreeing to submit to said William A. Read vouchers for the expenditure of the additional sum of twenty thousand dollars ($20,000), failing in which there shall be reserved from the said amount of the bonds to be delivered to them enough bonds at ninety per cent. of their face value to make up the difference.

"The said William A. Read proposes to undertake to place one million two hundred thousand dollars ($1,200,000) face value of said bonds at ninety per cent. of their face value, and this agreement shall cease and determine unless on or before sixty days from date he shall, by agreement in writing, bind himself firmly to take and purchase said bonds at said price.

"The proceeds of the sale of the said one million two hundred thousand dollars ($1,200,000) of bonds are to be applied: (a) to the purchase of property embraced in the options agreed to be transferred to the company by Messrs. Van Brunt and Kobusch; (b) for improvements and developments of the property; and (c) for working capital for the company.

"The said William A. Read shall hold and distribute the stock so delivered to him as aforesaid as follows:

"1. He shall transfer and deliver one million dollars ($1,000,000) par value of said stock unto the said W. T. Van Brunt or his assigns, and one million dollars ($1,000,000) par value of said stock unto George J. Kobusch or his assigns, the same being in full payment to them for their services in procuring the said properties for the company.

"2. He shall transfer and retain, as his own individual property, one million eight hundred and fifty thousand dollars ($1,850,000) face value of said stock in consideration of his services rendered and to be rendered in connection with the organization and promotion of the company.

"3. He shall transfer and deliver unto W. T. Van Brunt one hundred and fifty thousand ($150,000) par value of said stock for delivery to certain employés of the company, it being agreed by said Van Brunt that any of said stock not so employed shall be returned by him to Mr. Read, to be dealt with as hereinafter provided.

"4. He shall transfer and deliver unto James T. Gardiner five hundred thousand dollars ($500,000) par value of said stock.

"5. He shall set aside and hold five hundred thousand dollars ($500,000) of said stock, and out of the same transfer and deliver unto James T. Gardiner, at the expiration of each period of one year from the date of his original election as president of the said company, one hundred thousand dollars ($100,000) par value of said stock, which stock, together with that of the par value of five hundred thousand dollars ($500,000) to be delivered to him forthwith, as above provided, shall be received by the said James T. Gardiner in full compensation for his services as president of said company; and if at any time before the expiration of the full period of five years the same James T. Gardiner shall die or shall voluntarily cease to be the president of the said company, then, except as hereinafter especially provided, all of his interest in and to any portion of the said remaining five hundred thousand dollars ($500,000) of stock so set apart then undelivered to him shall cease and determine; provided, however, that so long as any portion of said stock shall remain set apart and held for his benefit the said James T. Gardiner shall be entitled to receive all dividends declared and paid upon every portion thereof, and provided, further, that if at any time before the full delivery of the entire balance of said stock to said James T. Gardiner a majority of the company shall cease to be held by the said W. T. Van Brunt, George J. Kobusch, William A. Read and James T. Gardiner, or some of them, then and thereupon the said Gardiner shall be entitled to the delivery to him of all portion of the said five hundred thousand dollars ($500,000) reserved stock then remaining undelivered.

"In case of the death or resignation of the said Gardiner during the year, a proportional adjustment shall be made with him for the fraction of the year.

"Any portion of the said five hundred thousand dollars ($500,000) of stock so set apart for the benefit of the said James T. Gardiner, together with any portion of the said one hundred and fifty thousand dollars ($150,000) of stock to be delivered to the said W. T. Van Brunt for the purposes above set forth, not actually used for such purposes shall be divided equally between the said W. T. Van Brunt, George J. Kobusch and William A. Read.

"All of the details of incorporation, form of the mortgage and the organization of the board of directors shall be determined by Messrs. Kobusch, Gardiner and Read.

"It is further agreed that if said William A. Read shall agree to take and pay for the one million two hundred thousand dollars ($1,200,000) of bonds aforesaid, as above provided, he or any firm of bankers of which he shall be a member shall be appointed sole financial agents and bankers for the company.

"In witness whereof, the parties hereto have subscribed this agreement the day and year aforesaid.                W. T. Van Brunt.
                                                "George J. Kobusch.
                                                "James J. Gardiner.
                                                "William A. Read."

At the time of the execution and delivery of Exhibits 24 and 25, the Randolph County Company had acquired, in round numbers, 23,-000 acres, for which the price paid was not less than $292,737.15, and, according to Van Brunt, between $300,000 and $400,000. In order to acquire the remaining property, which would make up the total of 47,000 acres, it was necessary to raise and expend additional money. The purpose was to acquire all of these 47,000 acres, and it was in respect of this whole aggregate field that Gardiner made his reports.

Some criticism was suggested because of the short time employed by Gardiner in his examination of these coal properties, but it seems to me that Gardiner, because of his ability and knowledge, could very well arrive at a conclusion after an examination much shorter in time than that which would be occupied by men less expert. In his report of January 11, 1905, Gardiner considered elaborately various phases of what he called the Randolph-Macon coal field of Missouri. He discussed the commercial situation, outlined the physical description, and pointed out the expected control of the field by the exercise of the Van Brunt options, which would add to the existing Randolph County Company holdings, so that the aggregate holding of a new company would be the 47,000 acres. He deduced his estimate of earnings from the data thus set forth, and finally strongly advised the purchase of the property in the following language:

"Although the well-operated companies in this field are now making about 30c. a ton on their coal and about 10c. a ton for powder sales and stores, or 40c. total, and although I believe the present price can be maintained and the cost of mining reduced, I think it safest to estimate 30c. a ton as the profit from operating the 10 mines which are now working on the Van Brunt options and the additional shaft which is being sunk. With an estimated output of 1,250,000 tons the first year, the net earnings of the operating company should be $375,000. The second year with an output of 2,000,000 tons the net earnings should be $600,000.

"In view of the rapid increase of demand for coal and the absence of other sources of supply, I should look for a steady increase in the production from this field and a consequent increase in the earnings of the company.

"I strongly advise the purchase of this property on account of the favorable mining conditions, the low cost of mining as compared with competitive fields, the established reputation of the coal, the unusual steadiness of the price for this fuel, the absence of competitive fields which could lower present prices, the geographical position of the four great trunk railways, the almost complete control of the field, the ownership of 200,000,000 tons of coal, and the fact that the 10 open and producing mines will give the operating company a large tonnage at the beginning of its business and an ample surplus the first year of operation."

On January 14, 1905, he made a further report, in which he said:

"The Randolph-Macon Coal Company is a recent consolidation of the operating coal mines and undeveloped properties in the isolated coal basin in Randolph and Macon counties in Northern Central Missouri. * * * There are 10 operating shafts and 47,000 acres of coal land containing 200,000,000 tons of coal."

After pointing out the prospects, transportation conditions, coal supply and proposed economics, he said:

"I think the property of the Randolph-Macon Coal Co. worth from $3,000,-000 to $4,000,000 as it stands and that it will rapidly increase in value from the developments of the next two years."

He concluded by an enthusiastic expression of expectation of the results to be attained, and stated that he had decided to take a personal interest in the company and accept its presidency. There is no question that the field was a valuable one, and that it was believed so to be by the defendants Gardiner, Read, and Van Brunt; and it was advantageous that the company should start with a man of the reputation which Gardiner had as a coal man.

The exact figures of $1,800,000 of bonds and $5,000,000 of stock at which the company was to be capitalized were not based on any accurate mathematical computation; but they were regarded by the promotors as a minimum well within the value of the property as estimated by Gardiner. It is urged that the valuations, under different dates, by Gardiner, were inconsistent; but, from the point of view of all concerned, as affecting the questions of good faith (Wickersham's testimony, vol. 4, pp. 1054, 1055–1061; Read's testimony, vol. 7, p. 2094), I find no inconsistency (see supplemental brief of defendants Read et al., page 40, subd. 2). That point of view was thus expressed by Read:

"I relied on Mr. Gardiner's estimates, which were that the property was a very valuable property, worth the full amount of the stock and bonds to be issued; that, as a *going concern, with capital behind it*, it had far greater value than it had as separate concerns in poor condition, in poor credit I should say possibly, antagonizing each other, competing for business. As a going concern, the coal in the ground had a fixed value which it was easily demonstrated was very large indeed, many times the amount of stock and bonds."

And an important element in the formation of Gardiner's judgment was that the property would be in the hands of a large and strong company having the knowledge and capital to develop its possibilities. Volume VII, pp. 2011 et seq. It is evident that these men thought that the property would earn its own way, and while, for various reasons, this result was not attained, I am satisfied that they honestly believed that the enterprise would stand the capitalization, and that they acted in that regard, in good faith.

The details and routine necessary to incorporate the company were conducted at St. Louis by attorneys of repute. Mr. William E. Fisse of the Missouri bar had been the personal counsel of Kobusch, and Messrs. Strong and Cadwalader were the attorneys for Read.

Mr. Fisse and Mr. Gale (an associate of Strong and Cadwalader) co-operated in preparing the Articles of Association of the coal company. These articles, bearing date January 23, 1905 (8 days after the date of the promotion contracts) were executed by Henry F. Vogel, one George A. H. Mills, and Mr. Fisse, all of the city of St. Louis. The articles set forth that the parties had associated themselves together for the purpose of organizing a corporation under the laws of the state of Missouri, and particularly under article 9, chapter 12, of the Revised Statutes of Missouri of 1899, and the various acts supplemental to and amendatory of the said article. The articles further set forth that the whole of the stock had been bona fide subscribed, and one-half thereof had been actually paid up in lawful money of the

United States, and was then in the custody of the persons named as the first board of directors.

Article fourth provided as follows:

"The names of the several shareholders of said corporation, and their residence, and the number of shares subscribed for by them respectively are as follows:

| | |
|---|---|
| Vogel | $4,999,800 00 |
| Mills | 100 00 |
| Fisse | 100 00" |

Vogel, Mills, and Fisse were named as the directors for the first year. Fisse testified that he had been requested to act in the matter of the incorporation of the company as local counsel by Mr. Gale, and that Vogel and Mills acted under his, Fisse's, directions. No one of these three had any pecuniary interest in the company. The first meeting of stockholders was held on January 24, 1905, and at this meeting a proposition in writing, dated January 24, 1905, was submitted from Vogel, addressed to the stockholders of the coal company. This proposition, briefly stated, was to sell and convey, or cause to be conveyed, to the company, in consideration of the payment and delivery of $5,000,000 par value of capital stock and $1,800,000 of first mortgage bonds, out of a total authorized issue of not more than $3,000,000, the property substantially the same as contained in the contract, Exhibit 24; that is to say, the 23,000 acres and the property to be acquired. This proposition was accepted, and then a resolution was passed, authorizing the use of $1,800,000 of bonds to pay Vogel part of the purchase price of the properties authorized to be acquired from him; the remainder of the issue, to wit, $1,200,000 to be reserved for future use by the company, as should thereafter be determined by the stockholders or the directors. Temporary certificates of stock were issued to Vogel, Mills, and Fisse to the extent of their subscriptions. Between January and August, certain certificates were surrendered and canceled and new certificates issued in lieu thereof until, on August 10, 1905, pursuant to a letter of instructions of William A. Read & Co., $1,850,000 of the stock theretofore issued was issued to the following: 900 shares to Metropolitan Life Insurance Co., 100 shares to John R. Hegeman, 200 shares to Hamilton Trust Co., 17,100 shares to William A. Read, 100 shares to Joseph H. Seaman, and 100 shares to John Hallett Clark. Shares of stock were issued to various persons pursuant to the direction of Van Brunt and, in brief, the stock was distributed in precise accordance with the promotion contracts.

The company was operated for about two years, during which time it failed to make money and encountered difficulties. At a meeting of the directors on February 4, 1907, the president, Mr. Gardiner, read a letter addressed to the stockholders and bondholders of the company, which, among other things, stated that the 1st of February had arrived with no money in the treasury to meet the interest on the bonds and to pay creditors. The board of directors authorized the president to have the letter printed and distributed among the stockholders, and adopted a resolution authorizing counsel of the company to enter an appearance of the company in any proceedings which might be brought

to foreclose the mortgage. On February 19, 1907, such proceedings were instituted by the Central Trust Company of New York, trustee under the mortgage, in the United States District Court for the Northern Division of the Eastern Judicial District of Missouri, and these proceedings resulted in a sale of the property by a special master of the court, the price received being $100,000. On March 26, 1907, the company was adjudicated a bankrupt. The allotment to Read of the $1,200,000 of bonds at 90 realized for the company $1,080,000. This money was largely used in the acquisition by the company of the property other than the Randolph county property. (The total paid for the Wabash, Bolan Darnell, Elliott, and properties other than the Randolph county, is figured by plaintiff to be $857,915,000, but the difference between that amount and the $1,080,000 is not important for purposes of decision of the issues herein.) This sum of $1,080,000 was the only money which came to the company in connection with its organization. The total holdings of the company were surface land, 1,035.24 acres, coal rights, 45,531.38 acres, leased rights, 1,246.75 acres.

From the record of which the foregoing is necessarily a meager outline, it is entirely clear that Read, Gardiner, Van Brunt, and Kobusch were in fact the subscribers to the capital stock of the corporation. The case was not one of a sale by Van Brunt and Kobusch, wherein Vogel, Mills, and Fisse were their agents for the transfer of the property, but Vogel, Mills, and Fisse plainly acted for all parties (merely as instruments in routine) to carry out the purpose and understanding expressed in the promotion contracts. Equity will brush away mere forms, and the result is the same as if Read, Gardiner, Van Brunt, and Kobusch had signed the articles of association with their own hands.

[1] Starting, then, with the proposition that Read, Gardiner, and Van Brunt, defendants here, were subscribers, the first inquiry is whether their obligations and duties are to be determined by the law of Missouri or by the law of the forum. It is insisted by the defendants that the decisions of the Missouri courts, in respect of the subject-matter, are contrary to long and well-established views announced by the federal courts and by other state jurisdictions, and that the responsibility, if any, of the defendants, depends upon the construction which this court will give to their acts irrespective of the authority of the Missouri courts, and that the rule which prevails in Missouri expresses the interpretation of the courts of that state, upon propositions of general commercial law quite irrespective of the Constitution or statutes of Missouri. The plaintiff, on the other hand, insists that the liability of the defendants is because of the requirements of the Constitution and statutes of Missouri. The main contentions may briefly be summarized as follows: Plaintiff urges that the issue of the capital stock was in pursuance of an actual fraud, in that the stock was issued for property knowingly grossly overvalued; that if, however, it be found that actual fraud was not practiced, then, nevertheless, the defendants are liable because, as matter of fact, the property conveyed for stock was far less in value than the amount of stock subscribed and delivered in payment. The defendants insist

that the transactions were undertaken and executed in good faith, that defendants are to be held liable only if actual fraud shall be found to have existed, and that, in any event, the property was fully worth the amount of stock subscribed and, indeed, of a value far in excess thereof. The defendants further contend that a suit may not be maintained by the trustee in bankruptcy, but only by a creditor who acted on the belief that the capital stock had been fully paid. There are other and minor contentions which may, to some extent, be later referred to.

[2] The Constitution of Missouri provides that:

"No corporation shall issue stock or bonds, except for money paid, labor done or property actually received." Constitution of Missouri, article 12, § 8.

"Dues from private corporations shall be secured by such means as may be prescribed by law, but in no case shall any stockholder be individually liable in any amount over or above the amount of stock owned by him or her." Constitution of Missouri, article 12, § 9.

Section 962 of the Revised Statutes of Missouri of 1899, which was in force at the time the Randolph-Macon Coal Company was organized, and which is still in force, is as follows:

"The stock or bonds of a corporation shall be issued only for money paid, labor done or money or property actually received."

After making provision for increases of stock, the section mentioned provides further:

"The shares of stock or bonds arising from such increase shall only be disposed of for money paid, labor done or money or property actually received. All fictitious issues or increase of stock or of bonds of any corporation shall be void."

The section quoted is the same section as that now known as section 2981 of the Revised Statutes of Missouri of 1909.

The section of the statutes of Missouri, under which this corporation was organized (article 9, chapter 12, Revised Statutes of Missouri of 1899, section 1319), provided as follows:

"Corporations may be created under this article for any of the following purposes:

"First.—To carry on any kind of mining, * * * business.

*     *     *     *     *     *     *     *     *     *

"Eleventh.—For any other purposes intended for pecuniary profit or gain, not otherwise specially provided for, and not inconsistent with the * * * laws of this state. * * *"

This section is now known as section 3346, Revised Statutes of Missouri of 1909.

Section 1312, of the Revised Statutes of Missouri of 1899, provided:

"Any three or more persons who shall have associated themselves, by articles of agreement, in writing, as provided by law, for any of the purposes included under section 1319, may be incorporated under any name or title designating such business."

It is further provided in said section that the Articles of Association shall set out among other things:

"Third.—The amount of the capital stock of the corporation, the number of shares into which it is divided, and the par value thereof, that the same

has been bona fide subscribed, and one-half thereof actually paid up in lawful money of the United States, and is in the custody of the persons named as the first board of directors or managers.

"Fourth.—The names and places of residence of the several shareholders, and the number of shares subscribed by each * * * purposes for which the association or company is formed. * * *"

This section is now known as section 3339, Revised Statutes of Missouri of 1909.

Section 1313, Revised Statutes of Missouri of 1899, provided that such Articles of Association shall be signed and acknowledged by the parties thereto, which is substantially the same section as section 3340 of the Revised Statutes of Missouri of 1909, which provides that "such articles of association shall be signed and acknowledged by the parties thereto."

There can be no doubt as to the doctrine laid down by the Missouri courts. That is announced in Berry v. Rood, 168 Mo. 316, 67 S. W. 644, where the court was dealing with questions which arose in regard to a Missouri corporation. There had been some uncertainty caused by the decision in Woolfolk v. January, 131 Mo. 620, 33 S. W. 432. But in Van Cleve v. Berkey, 143 Mo. 109, 44 S. W. 743, 42 L. R. A. 593, the Woolfolk Case was distinguished, and the prior case of Shickle v. Watts, 94 Mo. 410, 7 S. W. 274, was approved. In the Shickle and Van Cleve Cases, the Missouri courts were not dealing with Missouri corporations, and, on the close analysis suggested by the learned counsel for the defense, it might well be argued that the Missouri courts were applying their view of the law applicable to such cases, just as it is now insisted by the defendants that this court shall apply whatever the law may be in federal jurisdictions as a proposition of general commercial law as distinguished from the interpretation of a constitution or statute. But in the Van Cleve Case the Missouri court took pains to point out what it believed to be the law of Missouri in the following language:

"Upon a review of all the cases decided by the appellate courts of this state since the adoption of the Constitution of 1875, the ruling in all of which will be found to be in harmony, it is impossible to escape the conviction that in this state, whatever may be the case in some of the other states, the American trust doctrine, as suggested by Mr. Justice Harlan, has indeed been 'reinforced' by its Constitution and statutes, and that the proposition that the stock of a corporation must be paid for 'in meal or in malt,' in money or in money's value, is not a mere figure of speech, but really has the significance of its terms. It may be paid for in property, but in such case the property must be the fair equivalent in value to the par value of the stock issued therefor; that it is the duty of the stockholders to see that it possesses such value; that when a corporation is sent forth into the commercial world, accredited by them as possessed of a capital in money, or its equivalent, in property, equal to the par value of its capital stock, every person dealing with it, unless otherwise advised, has a right to extend credit to it on the faith of the fact that its capital stock has been so paid, and that the money or its equivalent in property will be forthcoming to respond to his legitimate demands. In short, that it is the duty of the stockholder, and not of the creditor, to see that it is so paid; hence the inquiry in a case between the creditor and a stockholder, when property has been paid in for the capital stock of a corporation, is not whether the stockholder believed or had reason to believe that the property was equal in value to the par value of the capital stock, but whether, in point of fact, it was such equivalent. This whole-

some and salutary doctrine, beneficial alike to the general public and to all corporations doing business with bona fide capital, so firmly applied in Shickle v. Watts, supra; and so well formulated in the foregoing quotation from the opinion of Gill, J., in the case of Shepard v. Drake, supra [61 Mo. App. 134], ought not to be in any way weakened or impaired by anything said in the opinion in the case of Woolfolk v. January, in criticism of a single expression in the opinion in Shickle v. Watts, and which criticism was obiter to the case then in hand."

Then came Berry v. Rood, 168 Mo. 316, 67 S. W. 644. There a receiver of a corporation appointed by the Missouri courts, brought an action at law to recover for unpaid subscriptions. The corporation was formed under the laws of Missouri with a nominal capital of $300,000 stated in its articles to have been all subscribed and fully paid in cash. None of the subscriptions were paid in cash, but the organizers were the owners of certain lands believed to contain valuable onyx deposits which, pursuant to the understanding among them from the beginning, they put into the concern at a valuation of $200,000 as in payment to that extent of their subscriptions, and one subscriber, being the owner of certain onyx works and machinery in Vermont, put that property in at a value of $90,000 as in payment of his subscription to that extent. The referee found that these deposits added little, if any, real value to the land, and, in brief, that the property turned in by the original incorporators was very greatly overvalued. The referee further found that there was no fraudulent intent or purpose in the transactions and in the incorporation of the company. The court held that where stockholders turn over property to a company and receive stock in payment therefor, such stockholders are respectively liable for the difference between the real value of the property turned over and the face value of the stock, and that judgment may be entered against the stockholders individually for so much of that difference as may be necessary to pay off the debts of the concern to such creditors as extended credit without knowledge of the fact that the corporation had accepted property in payment of stock, and for costs. The defendants say that this decision of Berry v. Rood is contrary to the principle announced in many cases that before a stockholder who takes stock for property may be held liable as for an unpaid subscription, it must be shown that the stockholder was guilty of a fraud, and if, in fact, the stockholder acted in good faith or was not guilty of fraud, then there may be no recovery in any event. Clark v. Bever, 139 U. S. 96, 11 Sup. Ct. 468, 35 L. Ed. 88; Fogg v. Blair, 139 U. S. 118, 125, 11 Sup. Ct. 476, 35 L. Ed. 104; Coit v. Gold Amalgamating Co., 119 U. S. 343, 7 Sup. Ct. 231, 30 L. Ed. 420; Taylor v. Cummings, 127 Fed. 108, 62 C. C. A. 108; Randall Printing Co. v. Sanitas Mineral Water Co., 120 Minn. 268, 139 N. W. 606, 43 L. R. A. (N. S.) 706; Hospes v. Northwestern Mfg., etc., Co., 48 Minn. 174, 196, 50 N. W. 1117, 15 L. R. A. 470, 31 Am. St. Rep. 637.

With these substantially different views claimed by counsel to be illustrated in many cases, it is necessary, at the outset, to arrive at a conclusion as to the nature and character of the transactions complained of. I am entirely satisfied (as I have heretofore indicated) that there was no fraudulent purpose or conduct in connection with the or-

ganization of this company. On the contrary, I am convinced that the promoters entered into the enterprise in good faith and with the greatest measure of confidence in its success. Read employed the best expert he could find, and he was a stranger to him. He employed counsel of recognized standing and ability to advise him in regard to and to conduct the legal details. Gardiner believed in his own reports, and they were such as to lead any one to conclude that the property was of great value. The stock was not shoved on the market nor sold in such a manner as to bring a profit to Read from the stock itself. It is true that Read made the sum of $60,000 by taking the bonds at 90 and selling them to the Metropolitan Life Insurance Company at 95, but that was a banker's commission which everybody perfectly understood, and which was earned on the theory that it takes money to get money. The confidence of Gardiner in the proposition is demonstrated by the fact that he was willing to take his compensation for services over a period of five years, in a stock allotment for each year. Van Brunt had already given the best evidence of his belief in the value and future of the property by undertaking with Kobusch to collect the original Randolph county holdings of 23,000 acres and to get the options for the remainder which went to make up the 47,000 acres. Read, Gardiner, and Van Brunt later lent the company money in the hope of working out of the difficulties. Therefore this is not one of those cases where a number of men associate together for the purpose of putting on the market knowingly grossly overvalued stock, the proceeds of the sale of which they convert to their own uses. I think any one reading this record will be satisfied that all these men believed that they had a large proposition with splendid possibilities and that they believed so thoroughly in the future of the company that they were willing and were glad, in the main, to hold their stock until it reached a satisfactory market value.

Arriving at this conclusion, I must determine whether the law of Missouri is applicable, or whether the case is to be controlled by authorities having the meaning which defendants urge is to be found in Clark v. Bever, supra, and the like.

I have not failed to appreciate the earnestness of the argument of the counsel for defendants, when they emphatically insist that Berry v. Rood did not construe the Constitution and statutes of Missouri. If the rights of the parties are to be adjudicated according to the Constitution and statutes of Missouri, then the doctrines of Berry v. Rood must prevail. Bernheimer v. Converse, 206 U. S. 516, 27 Sup. Ct. 755, 51 L. Ed. 1163; Converse v. Hamilton, 224 U. S. 243, 32 Sup. Ct. 415, 56 L. Ed. 749, Ann. Cas. 1913D, 1292. It seems to me that I should not strain to find that the Missouri court meant something different from what it affirmatively stated. In Berry v. Rood, the proposition was squarely before the court, and, in view of the opinions in the Shickle, Woolfolk, and Van Cleve Cases, the time had come when the Missouri court was called upon to take a position which would be clear and free from doubt. In Berry v. Rood reference is made to the Shickle, Woolfolk, and Van Cleve Cases, and the court said:

"In Van Cleve v. Berkey, supra, the authorities are reviewed and the law clearly defined in an exhaustive opinion by Brace, J., in which all concurred,

including the writers of the opinions in the two other cases. We feel that nothing is needed now to add to what is said in that opinion to demonstrate that our Constitution and statute mean that when property is taken in payment of stock the stockholder is liable at the suit of a creditor to account for the difference, if any, in value between the price at which the property was turned in to the company and the face value of the stock, and this is so even though no actual fraud be shown."

The position of the court was stated as follows:

"II. The main proposition, however, upon which reliance is had to sustain the judgment of the circuit court, is that a stockholder who has turned into the corporation property in payment of his stock which has been accepted by the corporation as the equivalent of the face value of the stock, and who has been guilty of no actual fraud, cannot be called to account by creditors of the concern, or made to pay in satisfaction of debts the difference between the value of the property turned in and the face value of the stock. This proposition as contended for, under the facts of this case, also draws a distinction, in favor of the stockholder, between actual fraud and legal fraud and leaves him on the safe side of the line, although the property he turned in was in fact worth less than 5 per cent. of the face value of the stock, provided we find that his mind had been so excited by indications of prospective mineral 'wealth that he really believed that, when the unexplored caverns should be opened, mines of fabulous value would be disclosed.

"If that is the correct interpretation of the law of Missouri on this subject, then the manifest efforts of the framers of our Constitution and the makers of our statutes to authorize the establishment of only conservative and reasonably safe business corporations has been 'in vain. Our Constitution ordains that 'no corporation shall issue stock or bonds, except for money paid, labor done or property actually received.' Article 12, § 8. The money, the labor, and the property mentioned, are on a plane, and signify equivalents. If property worth 5 per cent. of the face value of the stock can be taken as full payment, then 5 per cent. in money is equally available, and the Constitution affords the people no protection against the wildest schemes. This clause in the Constitution puts a limit on the power of the Legislature, so that if that body should attempt, it could not authorize the organization of a corporation with power to issue stock without receiving its equivalent in money, labor, or property. But whilst the Legislature cannot go beyond that limit, it is not compelled to go to the limit, and may, if it should see fit, make the restrictions as to issuance of stock more strict. In section 962, Revised Statutes 1899, the General Assembly follows the language of the Constitution, using the negative form of expression that stock or bonds shall be issued only for money, labor, or property. That section is general as to all corporations and will apply to all unless by law a different requirement is made for corporations of a particular class. Manufacturing and business corporations are treated in the statutes as a class in themselves, with some provisions applicable to them not applicable to other kinds of corporations. Section 1312, Revised Statutes 1899, governing this class of corporations, requires the incorporators in their articles of association to certify that the shares of capital stock have all been bona fide subscribed and one-half thereof actually paid up in lawful money of the United States and in the actual custody at that time of the persons named as the board of directors. Even in the face of that unequivocal language this court has held, in this kind of corporations, that the stock may be paid in labor or property, and that has been too long a rule of business conduct to question it now. But we make this reference to the emphatic language of our Constitution and statutes at this time to emphasize the fact that our lawmakers, as far as they could, have endeavored to place Missouri on conservative and safe grounds in this respect. And that this is understood by the business community is shown by the well-known fact that many corporations designed to operate alone in this state are organized under the laws of other states which are supposed to be more liberal to the promoters and less careful of the rights of persons who

may come in their way in the course of business. If we adopt the rule of construction of our written law that the referee and the trial court have laid down, then there will be no necessity for men to shun Missouri as a forum in which to organize the wildest and most visionary schemes, for by such interpretation we break down all the safeguards that distinguish ours from any other laws. But that is not the proper interpretation of our law."

I have quoted thus extensively from Berry v. Rood, because I can hardly imagine language any stronger to indicate that the Missouri court, in dealing with rights and liabilities of stockholders, in relation to Missouri corporations, was construing the Constitution and statutes of its own state. If it be said that the Missouri court wrote into the Constitution and statutes something that was not there, the answer is that that is a question of interpretation for the Missouri courts. If it be said that the doctrine thus announced is contrary to that which prevails in other jurisdictions, the answer is that this court has no occasion to go behind the Missouri decision to inquire independently into the soundness of the doctrine, viewed either from the standpoint of law or public policy. Once this court is satisfied that the Missouri court was construing the Constitution and statutes of Missouri, then the law of Missouri, as thus announced by her own court, must be followed in this jurisdiction.

I think that the federal courts have not been as alert to disregard the views of the state courts in respect of a question of this character as the defendants contend. In Clark v. Bever, supra, Justice Harlan took pains to point out that all the cases in the Iowa court were determined after the stock in question was acquired, and all, with one exception, after the litigation was commenced. While rejecting the view slenderly sustained by a narrow majority in the case of Jackson v. Traer, 64 Iowa, 469, 20 N. W. 764, 52 Am. Rep. 449, he clearly indicated the caution which the federal courts will exercise in departing from the view of the state courts. A reading of Jackson v. Traer, supra, will demonstrate that the decision in that case was on harsh lines which the United States Supreme Court was reluctant to accept; but Justice Harlan restated the well-known principle that federal courts will lean "towards an agreement of views with the state courts if the question seems to them balanced with doubt."

In Fogg v. Blair, supra, Justice Harlan calls attention to the fact that the doctrine there restated is the same as that of the Supreme Court of Missouri. The limits of the Clark v. Bever and Fogg v. Blair Cases were pointed out in Camden v. Stuart, 144 U. S. 113, 114, 12 Sup. Ct. 585, 36 L. Ed. 363. .

In Taylor v. Cummings, supra, the court is careful to conclude:

"We find no support in the decisions of the Illinois Supreme Court for the proposition on which reversal is sought."

In Kiskadden v. Steinle, 203 Fed. 375, 121 C. C. A. 559, the court follows the Ohio law.

In brief, a study of the decisions of the federal courts leads to the conclusion that it is very difficult, at times, to distinguish between those decisions which construe the Constitution or statutes of a state and those which interpret the so-called general law. This is peculiarly the fact in connection with questions that arise as to the obligations of a

stockholder to a corporation, and I think the underlying reason is that where persons become stockholders in a corporation, it may fairly be presumed, as matter of good sense and business experience, as well as a matter of law, that they have in mind the attitude of the courts of the state which has permitted the creation of the corporation. Whatever may be the difference of opinion as to the basic doctrine involved (and in this respect I express no opinion because unnecessary so to do), it is manifest that the Missouri court has worked out a simple, orderly, and uniform system in cases like this.

[3] What Berry v. Rood holds is that the liability for the difference between the amount subscribed and the actual value is contractual. Being such, it is an asset of the corporation applicable to the payment of debts, just as much as would be the balance due on a cash subscription. If Berry v. Rood is accepted as the law of this case, then must vanish most, if not all, of the distinctions which have been made between cash subscriptions on the one hand and the transfers of property for stock on the other.

Rescission is not necessary under the authority of Berry v. Rood, supra, nor would a court of equity require rescission where it is either a mere form or is impossible of accomplishment.

Further, it is perfectly clear that if the unpaid subscription under the principle of Berry v. Rood is an *asset* of the corporation, then the trustee in bankruptcy may collect the same. Babbitt v. Read (C. C.) 173 Fed. 712; Scoville v. Thayer, 105 U. S. 143, 26 L. Ed. 968; In re Remington Automobile & Motor Co. (D. C.) 153 Fed. 345.

It is urged, however, as one of the reasons why the trustee in bankruptcy cannot recover the unpaid subscriptions where stock has been received for property, that the creditor must show that he has acted in reliance upon the full payment of the capital stock. Defendants contend that there is a distinction between cases, on the one hand, where there is a cash subscription for stock with an agreement that the same may be satisfied by the payment of less or the giving of less value than par, or where stock is taken from the corporation as a bonus or gratuity, or there is a simulated cash subscription at par, and cases, on the other hand, where property has been purchased with an issue of stock. Speaking generally, such distinction is to be found in the books, although in some jurisdictions the question as to whether the creditor had knowledge of the method in which it was attempted to pay up the stock, is held to be immaterial (Eastern National Bank v. American Brick Co., 70 N. J. Eq. 722, 64 Atl. 1095), and in other jurisdictions there is authority for the proposition that the burden is on the stockholder, who relies upon such defense, to show the fact; if it exists, that the creditor had knowledge of the way the stock was paid. Northwestern Mut. Life Ins. Co. v. Cotton Exhange Real Estate Co. (C. C.) 46 Fed. 22–25; Gogebic Inv. Co. v. Iron Chief Mining Co., 78 Wis. 427–434, 47 N. W. 726, 23 Am. St. Rep. 417; Randall Printing Co. v. Sanitas Mineral Water Co., 120 Minn. 268, 139 N. W. 606, 608, 43 L. R. A. (N. S.) 706.

In support of their position, the defendants refer to Berry v. Rood, where it is said:

"If a person, knowing that a corporation has accepted certain property in full payment of its stock, sees fit, with that knowledge, to lend money to the corporation, he has no more right to call the stockholder to further account for his debt"

—nor do I see any practical difficulty in that connection.

But it will be noted that the court does not hold that the burden rests upon a plaintiff. On the contrary, it would seem that this expression in Berry v. Rood is harmonious with the view expressed in Van Cleve v. Berkey, supra (quoted in the Berry Case), where the court said:

"When a corporation is sent forth into the commercial world accredited by them (i. e., stockholders) as possessed of a capital in money, or its equivalent, in property, equal to the par value of its capital stock, every person dealing with it, *unless otherwise advised*, has a right to extend credit to it on the faith of the fact that its capital stock has been so paid and that the money, or its equivalent in property, will be forthcoming to respond to its legitimate demands. In short, that it is the duty of the stockholder, and not of the creditor, to see that it is so paid. * * * "

It is plain that upon this question the Missouri courts adhere to the same principle as is applicable to unpaid cash subscriptions. That principle is well expressed (in the brief of the defendants Read et al.), as follows:

"The implied contract of the subscriber by the acceptance of the stock, is one to pay the par value thereof, if necessary, for the satisfaction of the claims of creditors, and the debt is an asset of the corporation, which may not be released by it. The trustee in bankruptcy in such cases may maintain a suit for their benefit on the insolvency of the corporation to recover the unpaid amount on the par value of the stock as an asset of the corporation, as a trust fund for the benefit of creditors. In such a case, it would not be necessary for the creditor to show that he relied upon the faith of the full payment of the authorized capital stock. He has the right to assume that all existing subscriptions, whether he knows of them or not, and irrespective of the amount of the authorized capital stock, will be administered for his benefit. The case is no different from one in which a judgment creditor seeks to set aside a conveyance by the corporation of other kinds of property in fraud of him. There it would not be necessary for him to show that he relied, in extending credit to the corporation, upon the faith of the existence of the particular property, which had been or was afterwards conveyed away. It would be sufficient for him to show that he is a creditor and that property of the debtor had been conveyed away for the purpose of defrauding him. It will be presumed that he relied upon the ownership of the property by the corporation. *That he assented to the transaction or had knowledge of it when he became a creditor, so that he could not have relied thereon, would be matter of defense.*"

The creditors in the case at bar are divided into two classes, to wit: (1) The general creditors; and (2) the deficiency judgment creditors represented by the deficiency judgment of the trustee under the mortgage, to wit, the Central Trust Company. Of the creditors represented in the deficiency judgment, there is the subdivision called the Mackay group. In view of the fact, alleged as a partial defense by the defendants, that a provision in the mortgage as to "no recourse" availed them as against the deficiency judgment, the trustee in bankruptcy procured leave to file, and did file, a supplemental bill, in which he set forth facts intended by him to show equitable grounds why this defense

should not prevail if otherwise a valid defense, and particularly why it should not prevail against the claims of the bondholders known as the Mackay group, who had purchased their bonds, as they asserted, under circumstances different from other bondholders.

At the time of filing the original bill, the claims of bondholders had been disallowed in bankruptcy by the referee on the ground that their claims were merged into the deficiency judgment entered in favor of the Central Trust Company as trustee under the mortgage, and that there could be no allowance of the bonds in view of the allowance of the deficiency judgment. This disallowance of the bonds as claims in bankruptcy was reversed by the United States Circuit Court of Appeals for the Eighth Circuit, in Mackay v. Randolph-Macon Coal Co., 178 Fed. 881, 102 C. C. A. 145. The original disallowance of bonds applied to 2,119 bonds. The appellants from the order of disallowance were the owners or persons interested in 353 of said disallowed bonds, and consequently the final judgment of allowance, pursuant to the appeal, related to only 353 out of the 2,119 bonds previously disallowed. The supplemental bill alleges that the holders of these 353 bonds are creditors of the Randolph-Macon Coal Company, that their rights and claims devolved upon the plaintiff as trustee in bankruptcy, and that the trustee is entitled to recover in respect of the claims of the several appellants to the extent in the aggregate of the bonds so allowed, to wit, $354,574.72, with interest. For reasons hereinafter outlined, I am of opinion that neither the Central Trust Company nor the Mackey group can prevail.

The total of claims under Exhibit A is $2,376,041.93, and, substracting the deficiency judgment of $2,149,729.45, the balance of $226,312.-48 represents the claims of the general creditors as distinguished from the claim of the trustee under the mortgage or the claims of the Mackay group. This amount, with reasonable counsel fee and costs, if any, will represent the outside sum for which the defendants Read, Gardiner estate, and Van Brunt are liable. It becomes necessary, therefore, to examine the testimony relating to the value of the property. Here, broadly stated, there are two absolutely different theories of value. Plaintiff's theory is that the property is worth no more than was paid for it. The theory of defendants is concisely stated as follows:

"This was an enterprise formed for the purpose of mining and selling coal to consumers, and not to purchase and sell coal lands as such. The tonnage of coal in the ground was the capital of the company, and its value depends upon the possibility so to utilize that capital that it will ultimately be distributable as capital, and, in addition, yield a profit thereon.

"It is not a matter of speculation upon which the opinion of an expert is based, * * * but is a matter determined by fixed and definite proof. In the district in question a charge of 5 cents, and ever a greater sum, per ton can be made against capital account, and, after charging all other items of cost, a minimum profit of 10 cents a ton and an average profit of 20 cents a ton can be and is earned. It is also established that there exists a market sufficient to absorb the coal as the same was to be mined in the contemplation of the company, and that the available tonnage is such that, at the minimum rate of 5 cents a ton, the coal can conservatively be said to have a capital value of over $13,000,000."

The "earning" basis to which Gardiner referred, say the defendants, is the correct basis, and the one on which they stand. In approaching the consideration of actual value, we must discard all questions of good faith; for the inquiry now is what, on the evidence, the property was worth. Plaintiff contends that the tonnage basis is illusory and impractical and that one of the serious difficulties encountered in connection with Gardiner's estimates of earnings, was lack of capital. The total issue of bonds, in addition to the $1,800,000, did not exceed $350,000 at par. The company expended $322,369.55 in improvements, and its entire working capital seems to have been $180,-000, loaned by its directors in cash and credit. I am not unmindful of the unexpected troubles of the company (due partly to the sickness of Mr. Gardiner) in the matter of bad management and strikes, nor have I failed to appreciate the changed market conditions, but any one may well ask whether the enterprise might not have stood on its feet if it had had sufficient capital to live through its troubles. This is a very practical question which men like Read, Gardiner, and Van Brunt consider when they undertake an enterprise. They were not figuring on a theoretical basis. Valuable units, they believed, increased in value if aggregated into "a going concern with capital behind it." As a going concern with capital behind it, interest would be paid and dividends earned on the stock. This, they supposed, the property would do of itself without (relatively speaking) much cash, but they were mistaken.

We are thus brought to a consideration of the theories of the defense, now presented as to value, but not developed prior to the incorporation of the company. Defendants contend that their experts have sustained calculations and not theories, but I cannot escape the conclusion that the testimony unfolds theoretical computations as distinguished from business market values. Testimony was adduced from which it appeared that there were two methods of mining, one known as the "room and pillar" and the other as the "long wall" system, the latter producing greater results. The tonnage basis of calculation is that which assumes the tonnage of coal in the ground irrespective, however, of the time that it would take to pay this coal on the surface ready for shipment and market requirements. There is much testimony on this subject, the net result of which is that the company owns coal in the ground of the aggregate value of many millions, which, through a long period of years (indeed centuries), can or will be mined. Under the royalty system the owner leases, as it is called, the right to mine coal upon the payment by the operator of a specific sum per ton for every ton mined. The minimum royalty which prevailed in this neighborhood was five cents a ton, and there were instances where the royalties exceeded that amount. It is contended by defendants, for instance, that upon a royalty basis, and with but 60 per cent. of the coal being mined, the property had a value of over $12,-000,000 and in any event that whatever might be adopted as the amount of the royalty from five cents up, and after an allowance of so many cents per ton for extinguishment of capital account, the value of the property was many millions in excess of $6,800,000. Again, to illustrate, upon a basis of 6,453 tons of coal to the acre extracted, less

10 per cent., by the "long wall" system, 5,807.70 tons per acre would be susceptible of being extracted, and, charging two cents a ton for extinguishment of capital account, on the basis of Mr. Doubleday (an expert for plaintiff), and adding a further charge of only six cents a ton as royalty, the defendants arrive at the figure of $21,830,090 for the 47,000 acres owned by the company.

There is more than one difficulty with the theories of the defendants. Value, of course, means market value. It surely cannot be an abstraction. There is force in the argument of the plaintiff that actuarial figures dispose of the theories of the defendants. From the standpoint of practical business dealing, a ton of coal mined a century hence certainly cannot be worth a ton of coal extracted from the mine to-day. A problem of this kind involves somewhat complex questions of interest, extinguishment account, and the like, and one would soon be lost in the labyrinth of pure theory. We are living in a time of practical business and commercial problems and engagements, and I cannot bring myself to believe that the theories of the defendants on the question of value are anything more than theories. Further, as is pointed out by counsel for plaintiff, neither the tonnage basis nor the royalty system was the settled customary method in this coal field. Some mines were operated under a royalty basis, but not many. The real question is, How much, under all the facts and circumstances, viewed from a practical business standpoint, were these properties worth? My own notion is that the real value was somewhere between the two extremes contended for by the parties hereto. It may very well be that there is substantial added value in collecting into a controllable whole a considerable number of units. Such a control gives a better opportunity for influence upon the market and for economies in various directions of management and administration. But the difficulty is that there is no proof in this regard as to what, if any, increase in value, as such, there was between the units considered separately and these units when aggregated into a field of 47,000 acres; and plaintiff is right when he insists that the *evidence* fails to show a basis upon which added combination value may be figured. Plaintiff's Reply Brief, December 12, 1913, p. 94. If defendants' views are not accepted, the value, according to plaintiff, would be $1,150,652.15— or say not to exceed $1,800,000.

As there is an action pending in the state courts, and as I am unable to foresee what further litigations may come on between the interested parties, I think that it is well that I should not find that this property was worth a definite figure in so many dollars and cents. But I must find upon this record that the property was worth, in any event, a value sufficiently less than $6,800,000 to require, if necessary, that there be furnished a sum large enough to pay the claims, as shown in Exhibit A, of all general creditors, with interest, and such reasonable counsel fee and costs as may be determined.

My conclusion, therefore, on this branch of the case is that the trustee is entitled to recover in this suit as against Read, Van Brunt, and the executors of Gardiner jointly and severally an amount sufficient to pay the claims, with interest, of such general creditors as may be en-

titled to be paid in accordance with the principles as to liability herein indicated, together with such counsel fee and costs as may be determined. In the situation presented in this record, the interlocutory decree may provide for the ascertainment of this amount by a master, or otherwise as may be determined upon the settlement of the decree. By this method multiplicity of suits is avoided, all interested parties will have appropriate opportunity to be heard in one proceeding, and such subsidiary proceedings may be had herein as may be proper and necessary.

### The Supplemental Bill.

[4] As concerns the Central Trust Company deficiency judgment, various contentions are presented, but the sole question really is whether the so-called "no recourse" clause of the mortgage avails these defendants. Each of the bonds contain a statement that it was one of a series of 3,000 bonds "all of them equally and without preference, one over the other, secured by a certain mortgage." The bond further provides that:

"This bond is entitled to the benefit of the sinking fund * * * as provided in the said mortgage, and is entitled to all other benefits and is *subject* to all the provisions of the said mortgage as if the same were herein fully recited."

### The twenty-second paragraph of the mortgage is as follows:

"Twenty-second: No recourse under any obligation of this mortgage or of any bond or coupon hereby secured shall be had against any incorporator, officer, stockholder or director of the company, either directly or through the company, by the enforcement of any right or claim, statutory or otherwise, or by any legal or equitable proceeding, it being expressly agreed and understood that this mortgage and the bonds secured hereby are solely corporate obligations which shall derive no support or aid by or through the personal liability of and that no personal liability whatever shall attach to or be incurred by the incorporators, stockholders, officers or directors of the company, or any of them, under or by reason of or founded, whether wholly or partly, directly or indirectly, upon any of the obligations of this mortgage or of any of the bonds or coupons hereby secured. But every and any such personal liability of every such incorporator, stockholder, officer or director is hereby waived as a condition of and consideration for the execution of this mortgage and of such bonds and coupons."

Plaintiff contends that the provisions upon which the defendants rely for a waiver or discharge of any liability in respect of the bonds cannot avail the defendants because: (1) The said provisions do not relate to the liabilities asserted by plaintiff; (2) they do not apply to the claims based on the bonds; and (3) such provisions are against public policy and void. These contentions are not impressive. The bondholder was bound by the terms of the mortgage, and we well know that in the absence of representations to the contrary, the purchaser of bonds of this character looks to the security of the mortgage. He rarely has any concern with anything else. The twenty-second paragraph of the mortgage clearly referred to any right or claim, statutory or *otherwise,* and the explanatory clause, "it being expressly agreed and understood that this mortgage and the bonds secured hereby are solely corporate obligations, * * *" made additionally

215 F.—27

plain (if such were necessary) the intent of this clause. Such a clause is one quite familiar in bond issues, and unless used as a part of a scheme to defraud, it is not only not against public policy, but I think is a fair and proper protection with which stockholders have the right to surround themselves. Cook on Corporations, § 216; Carnahan v. Campbell, 158 Ind. 226, 63 N. E. 384; Robinson v. Bidwell, 22 Cal. 379, 388; 10 Cyc. 665; Grady v. Graham, 64 Wash. 436, 116 Pac. 1098, 36 L. R. A. (N. S.) 177.

The books are full of instances where some liability, of which no one thought at the time, arises thereafter when unexpected disaster overtakes an enterprise. The "no recourse" clause is designed to protect against the unexpected and uncontemplated. The case at bar is a striking illustration of just the kind of situation to guard against which a clause of this character is erected, and erected so plainly as to give fair notice to any one buying the bonds. Here these defendants and their associates never supposed for a moment, at the time of the organization of the company, that they would be subjected to any suit for failure to pay up subscriptions. The bond issue was not overdone, competent lawyers had been employed, a competent expert had examined the property, and the day this mortgage was executed each interested party undoubtedly looked forward to a successful future for the property. To say now that the owners of these bonds, who did or could look at the property itself for their security, can brush aside the "no recourse" clause would be to capitalize an afterthought.

## As to the Claims of the Mackay Group.

I think that an elaborate analysis would not be serviceable, because whoever may have occasion hereafter to consider this subject must examine all the testimony. The circumstances under which the Mackay group claim, through the trustee, to be in a stronger position for recovery than others arises out of the sale of the Van Brunt and Kobusch $600,000 of bonds. They claim that they were misled by the use of the word "lands," coupled with certain representations made to them by Van Brunt, Kobusch, and Gardiner. It is indeed seriously questionable whether the trustee in respect of these claims has any standing in this suit. His position is entirely different from that discussed under the original bill, because here the recovery is sought upon the theory that fraud has destroyed the protection of the "no recourse" clause. Cheney v. Dickinson, 172 Fed. 109, 111, 96 C. C. A. 314, 28 L. R. A. (N. S.) 359. But in view of the great mass of testimony taken upon this subject, and of the fact that these bondholders, acting through the trustee, have sought this forum, this branch of the case may as well be decided on the merits now as at any other time.

I think that on the facts in this case, the defendants Read, Gardiner, and Van Brunt did not intend to mislead the Mackay group by the use of the word "lands" as it occurs in the Gardiner letters and in the mortgages, nor was the Mackay group misled. The claim is that it was the intention of Read, Gardiner, and Van Brunt to have it appear that the corporation asserted ownership in the surface land, and that the bondholders were justified in relying upon this representation and interpretation.

In addition to what was said by Judge Hand in Slater Trust Co. v. Gardiner (C. C.) 183 Fed. 268, I may observe that the record in this case is fuller and even more convincing than that before him. There is abundant proof in the record that the words, "coal lands" and "lands," when used in connection with coal properties, are understood as referring solely to the seam of coal itself, and, as I understand the testimony adduced on behalf of plaintiff in this regard, the most that it amounts to is that these words do not necessarily refer only to coal rights as distinguished from the ownership of the surface.

It is very difficult for me to believe that experienced men or average investors in bonds of this character, who are supposed to possess at least some degree of care and intelligence, would, when purchasing bonds of this character, be thinking of the value of the surface as so much land or so many farms rather than the value of the property from the security standpoint as a property out of which coal was to come.

As to what may be called active representations, I see no warrant whatever for the claim in this suit as against Read. He did not endeavor to sell these bonds, and he did not make any representations in respect thereof.

As to Gardiner, it may be said, also, that he had no interest in these bonds, and there was little justification for this claim against him. Mr. Kendrick of the Mackay group is not at all clear as to whether Kobusch or Van Brunt made the statements as to the value of the property as farm lands upon which he, Kendrick, relied. Brought down to its last analysis, Kendrick's testimony must be construed as showing that he did not rely on the language of the letters and the mortgages alone, but on the language of these papers in conjunction with what he says Van Brunt told him about the valuable farm lands, and that it was the combination of these two things which caused him to believe that the company owned the surface of the land as well as the coal rights. Van Brunt denies positively that he made any such statement to Kendrick, and certainly as between Kendrick and Van Brunt, the former has not borne the burden which is cast upon him. But quite irrespective of this, it is as plain as anything can be that Kendrick fully understood the situation as to the stock, and believed that it did not represent any actual money paid in, but was, as he called it, "watered stock." Pages 1397, 1398.

Mackay & Co., who bought the bonds for the purpose of reselling them, unfortunately made certain representations that the bonds were secured by a mortgage upon farm lands. This unfortunate error was not based upon anything said by Read or Gardiner, nor indeed was it solely caused by what, it is claimed, Van Brunt said, but was apparently founded upon the report made to Mackay & Co. by one of their own agents, Mr. Woodward, a bond salesman who was in their own employ, and who had been directed to investigate the subject. Space will not permit extended extracts from the testimony, but I have no hesitation in saying that (while I do not adopt the descriptive comments), my conclusions as to the testimony are substantially the same as those set forth under point XI of the brief on behalf of Read et al.,

beginning at page 253 thereof, and that means that I find affirmatively on this branch for the defendants Read, Gardiner, and Van Brunt.

## As to Defendants Other Than Read, Gardiner, and Van Brunt.

[5] Metropolitan Life Insurance Company holds 900 shares of the capital stock of the Randolph-Macon Coal Company, Hegeman holds 100 shares, and Hamilton Trust Company 200 shares. There is no proof in the record that either Hegeman, the Metropolitan Life Insurance Company, or the Hamilton Trust Company had knowledge or notice of the circumstances under which the stock was issued, or the consideration paid therefor. The Metropolitan Life Insurance Company was merely a purchaser from Read of $1,200,000 of the bonds and $120,000 of the stock of the Randolph-Macon Coal Company. Mr. Dutcher, the president of the Hamilton Trust Company, was a member of the finance committee of the Metropolitan Life Insurance Company, and on behalf of his company took $200,000 of the bonds and $20,000 of the stock purchased by the Metropolitan. The stock standing in the name of Hegeman was part of the remaining $100,000 of Metropolitan stock. The Metropolitan Life Insurance Company and the Hamilton Trust Company paid to Read $1,140,000 for the $1,200,-000 of bonds and $120,000 par value of stock purchased by them. This was the only connection of either of these companies with the transaction.

The fact that payments on account of the purchase of the bonds and stock were made from time to time in accordance with Read's directions prior to the actual delivery of the securities has no significance. Payment on account for securities prior to actual delivery is a familiar business occurrence, and does not charge the purchaser with notice of anything except the fact that the securities are not yet ready for actual delivery.

Hegeman states with respect to his going on the board of the Randolph-Macon Coal Company that Read spoke to him about the matter, and that there was some discussion about it at the meeting of the finance committee. The first meeting of the board that he attended was on August 1, 1905. It was at the August meeting of the board that Hegeman as a stockholder of the company signed the instrument dated March 18th, purporting to ratify the corporate proceedings theretofore had. There is no evidence that he ever read or heard read the description of the properties of the Randolph-Macon Coal Company contained in the mortgage and supplemental mortgage, or that he participated in any manner whatsoever in any representations made to purchasers of Randolph-Macon Coal Company bonds. The Metropolitan Life Insurance Company, Hegeman, and Hamilton Trust Company were bona fide purchasers for value of the stock which stands in their names. On the evidence in this case, the fact that the stock may have been considered as a bonus did not charge these defendants with notice; but, even if they had examined the records then available, they would have been well justified in concluding that the stock subscription was full paid. Erskine v. Loewenstein, 82 Mo. 301; Dickerman v. Northern Trust Co., 176 U. S. 181, 20 Sup. Ct. 311, 44 L. Ed. 423.

As to the other defendants, there is so little to support the cla'm of plaintiff, that the subject needs no discussion.

### Conclusion.

A decree will go against the defendants Read, executors of Gardiner and Van Brunt, jointly and severally, to pay to the trustee in bankruptcy such amount as may be necessary to pay in full, with interest, the claims of those general creditors who may be entitled thereto. Questions as to costs and counsel fee will be taken up on the settlement of the decree.

The decree will go against the plaintiff as here indicated, so far as the claims of the Central Trust Company. as trustee, and the Mackay group are concerned; and the defendants, other than Read, Gardiner, and Van Brunt, may have a dismissal of the bill in all respects.